2007 ME 69

**MAINE ASSOCIATION OF HEALTH PLANS et al.**

v.

**SUPERINTENDENT OF INSURANCE et al.**

Supreme Judicial Court of Maine.

Argued: Feb. 13, 2007.
Decided: May 31, 2007.

D. Michael Frink, Esq., George M. Linge, Esq., Curtis Thaxter Stevens & Micoleau, LLC, (for Maine Ass'n of Health Plans), William H. Stiles, Esq., Brett D. Witham, Esq., Verrill Dana, LLP, Portland, (for Maine State Chamber of Commerce), Bruce C. Gerrity, Esq. (orally), Roy T. Pierce, Esq., Preti Flaherty Beliveau & Pachios, LLP, Augusta, (for Maine Automobile Dealers Ass'n Ins. Trust & the Bankers Health Trust), for plaintiffs.

G. Steven Rowe, Attorney General, William H. Laubenstein III, Asst. Atty. Gen. (orally), Augusta, (for Dirigo Health Agency), Rufus E. Brown, Esq. (orally), Brown & Burke, Portland, Joseph P. Ditre, Esq., Augusta, (for Consumers for Affordable Health Care Coalition), for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, CALKINS, LEVY, and SILVER, JJ.

Dissent: ALEXANDER, J.

SAUFLEY, C.J.

[¶ 1] We are called upon in this appeal to review one of the funding sources of the Dirigo Health program. Several representatives of health insurers and other payors of health care costs in Maine challenge the decisions of the Dirigo Health Board of Directors and the Superintendent of Insurance that resulted in a calculation of the "aggregate measurable cost savings" to those payors. That calculation will determine the amount that the payors must pay to Dirigo Health to assist in the program's funding. The legal question presented is whether the Board, and consequently the Superintendent, erred in interpreting and applying the phrase "aggregate measurable cost savings." We affirm the Superior Court's (Cumberland County, *Cole, J.*) judgment, according deference to the reasonable interpretation of an ambiguous statute by the Board and the Superintendent.

## I. BACKGROUND

[¶ 2] The Dirigo Health program is the health insurance program that was proposed by Governor Baldacci and authorized by the 121st Maine Legislature in 2003 as part of a broader act aimed at increasing access to affordable health insurance in Maine. *See* P.L.2003, ch. 469 (effective Sept. 13, 2003). After its start-up year, during which the Dirigo Health

program was supported through general fund dollars, it was expected to be funded in part by "offset payments" to the State from health insurers and other payors. The amount of the offset payments due from the payors is to be calculated through use of a factor referred to as the "aggregate measurable cost savings," as described in 24–A M.R.S. § 6913(1)(A) (2006). The method by which aggregate measurable cost savings are calculated affects the amount that may be recouped from the payors to provide funding for Dirigo Health. *See* 24–A M.R.S. § 6913(2)(C) (2006). The administrative determination of the method for calculating the aggregate measurable cost savings is before us on appeal today.

[¶ 3] As required by law, the Dirigo Health Board of Directors, after a hearing, calculated aggregate measurable cost savings, arriving at a figure of $136.8 million for the first year in which offset payments are required.[1] The Superintendent of Insurance, after further hearing, reduced the calculation of cost savings to $43.7 million and otherwise approved the Board's decision.

[¶ 4] Several entities representing the interests of payors, specifically, the Maine Association of Health Plans, the Maine State Chamber of Commerce, the Maine Automobile Dealers Association Insurance Trust, and the Bankers Health Trust (collectively, the Association), appealed the Superintendent's decision to the Superior Court. The Superior Court affirmed the Superintendent's decision. The Association has appealed from the judgment of the Superior Court, arguing that the Board originally interpreted the term "aggregate measurable cost savings" too broadly and, as a result, the Superintendent erred in including certain measures of savings.

A. Unique Nature of Dirigo Health

[¶ 5] The Dirigo Health program is a unique statutory creation. It is not based on a uniform or model act. *Compare with* Uniform Health–Care Decisions Act, 18–A M.R.S. §§ 5–801 to 5–818 (2006). It has not been derived from the workings of another state's program.[2] It has no history in the common law. Rather, it represents the efforts of the Governor and the Legislature to respond to a perceived social problem in a manner that had not been tried before.

[¶ 6] Thus, in resolving the disputes that have arisen between and among the parties before us, we find no substantive guidance through precedent. We are limited to the plain language of the statute and,

1. For the first year of operation, state and federal funds—not an offset—funded the program. *See* Comm. Amend. A to L.D. 1611, No. H–565, Summary & Fiscal Note (121st Legis.2003). However, "[a]fter July 1, 2005, funding for subsidies and the Maine Quality Forum must be provided through savings offset payments paid by health insurance carriers, employee benefit excess insurance carriers and third-party administrators." Comm. Amend. A to L.D. 1611, No. H–565, Summary (121st Legis.2003). *See* 24–A M.R.S. § 6913(3)(E) (2006) ("Savings offset payments may not begin until 12 months after Dirigo Health begins providing health insurance coverage."). Because the Legislature repealed and replaced section 6913(2) after

the twelve-month period expired, *see* P.L. 2005, ch. 400, § A–11 (effective Sept. 17, 2005), the current statute does not contain the provision requiring offset payments to begin after twelve months. Before the amendment, however, the statute provided, "Payment of the savings offset amount must begin 12 months after Dirigo Health begins providing health insurance coverage." 24–A M.R.S.A. § 6913(2) (Supp.2003).

2. Although the Governor's office, in responding to the inquiries of the Joint Select Committee on Health Care Reform, noted other states' efforts to implement state sponsored health plans, Maine's legislation is unique and is not identical to any other state's program.

where ambiguities exist, the legislative record. Well-settled rules of statutory construction are critical, as is legislative history when interpreting any ambiguous language in the statute.

## B. Legislation Aimed at Increasing Access to Health Insurance

[¶ 7] We turn then to the statute at issue. In late 2002, the Governor proposed legislation intended to provide increased access to affordable health insurance in Maine. The Legislature passed an amended version of the Governor's proposal in 2003 as "An Act To Provide Affordable Health Insurance to Small Businesses and Individuals and To Control Health Care Costs." P.L.2003, ch. 469. In addition to creating the Dirigo Health program, the Act initiated other changes in health care delivery in Maine.

[¶ 8] The Act set forth a number of methods by which health care costs in Maine could be reduced. Among other things, the Act created the capital investment fund to limit the resources allocated annually pursuant to the certificate of need program, P.L.2003, ch. 469, § B–1 (codified at 2 M.R.S. § 102 (2006)); mandated that a certificate of need may be granted only if the project can be funded with the capital investment fund, P.L.2003, ch. 469, § C–8 (codified at 22 M.R.S. § 335(1)(E) (2006)); created the Advisory Council on Health Systems Development to gather and analyze data on health systems development in Maine and required the Governor to adopt a State Health Plan with input from this Council and other agencies and organizations, P.L.2003, ch. 469, § B–1 (codified as subsequently amended at 2 M.R.S. §§ 101–105 (2006)); suggested that each health insurance carrier voluntarily limit the pricing of products to no more than 3% underwriting gain, less federal taxes, for the 2003–2004 fiscal year, P.L. 2003, ch. 469, § F–1(1)(C); requested that hospitals voluntarily restrain cost increases, measured in expenses per case mix adjusted discharge,[3] to 3.5% or less and hold hospital consolidated operating margins[4] to no more than 3% during the 2003–2004 fiscal year, P.L.2003, ch. 469, § F–1(1)(B); and established the Commission to Study Maine's Community Hospitals, P.L.2003, ch. 469, § F–3, which ultimately recommended that the Legislature budget and pay past obligations to hospitals promptly and revise future periodic interim payment estimates to include a realistic forecast of the increased use of Maine-Care, and that the State increase Maine-Care payments to physicians and hospitals to cover their costs, see Commission to Study Maine's Hospitals, Report to the Legislature 5 (Feb.2005).

[¶ 9] In the context of this broader Act, the Legislature also created the Dirigo Health program, the funding of which is at issue in this appeal. See P.L.2003, ch. 469, § A–8 (codified as chapter 87 of title 24–A). Dirigo Health was created "as an independent executive agency" that "arrange[s] for the provision of comprehensive, affordable health care coverage to eligible small employers, including the self-employed, their employees and dependents, and individuals on a voluntary basis." 24–A M.R.S. § 6902 (2006); P.L. 2003, ch. 469, § A–8.

[¶ 10] The operation of Dirigo Health is supervised by the Board of Directors, which consists of five voting members appointed by the Governor, subject to review by the joint standing committee of the Legislature with jurisdiction over health insurance matters and confirmation by the

---

**3.** The case mix adjusted discharge measures the cost of inpatient and outpatient services provided by hospitals and their subsidiaries.

**4.** The consolidated operating margin measures profitability.

Senate, and three ex officio nonvoting members (the Commissioner of Professional and Financial Regulation or his or her designee, the director of the Governor's Office of Health Policy and Finance or the director of a successor agency, and the Commissioner of Administrative and Financial Services or his or her designee). 24-A M.R.S. § 6904(1) (2006).

[¶ 11] The voting members of this Board must have knowledge and experience in one or more of six enumerated finance-or health-related areas. 24-A M.R.S. § 6904(2)(A) (2006). In addition, voting members may not be representatives or employees of insurance carriers or health care providers doing business or operating in Maine, or affiliates of a health or health-related organization regulated by Maine. 24-A M.R.S. § 6904(2)(B) (2006).

[¶ 12] Dirigo Health is authorized by statute to "establish sliding-scale subsidies for the purchase of Dirigo Health Program coverage paid by eligible individuals or employees whose income is under 300% of the federal poverty level," and "for the purchase of employer-sponsored health coverage paid by employees of businesses with more than 50 employees, whose income is under 300% of the federal poverty level." 24-A M.R.S. § 6912 (2006).

[¶ 13] At its core, the Dirigo Health program is intended to provide insurance to small businesses that could not otherwise afford to obtain health insurance for their employees. To make that possible, the Dirigo Health program subsidizes that insurance. Because Dirigo Health does not, after the first year, have its own comprehensive private or public funding to accomplish that goal, the funds for providing the subsidy must be found from other sources. Funding was anticipated to be obtained from three primary sources: first, employer and individual contributions, see 24-A M.R.S. § 6910(4) (2006); second, available federal funds, see 24-A

M.R.S. §§ 6908(1)(I), (9), 6914 (2006); Comm. Amend. A to L.D. 1611, No. H-565, Fiscal Note (121st Legis.2003); and third, recoupment of savings anticipated to be experienced by insurers and third-party administrators following the implementation of the Act, see 24-A M.R.S. § 6913 (2006).

[¶ 14] It is the nature of this latter source of funding—the recoupment of savings—that brings the parties before us. Pursuant to statute, "health insurance carriers, 3rd-party administrators and employee benefit excess insurance carriers" are responsible for making a "savings offset payment" to Dirigo on an annual basis. 24-A M.R.S. § 6913(3) (2006). To calculate the savings offset payment each year, the Legislature directed the Board of Directors of Dirigo Health to determine the "aggregate measurable cost savings." 24-A M.R.S. § 6913(1)(A); see also P.L.2003, ch. 469, § A-8 (providing the original "aggregate measurable cost savings" language of section 6913(1)).

[¶ 15] No comprehensive definition of "aggregate measurable cost savings" was contained in the original Act, which the 121st Legislature enacted during its first regular session, to take effect on September 13, 2003. P.L.2003, ch. 469. In the first special session of the 122nd Legislature, recognizing a need for greater clarity and guidance, the Legislature passed An Act To Modify Savings Offset Payments and To Clarify Certain Other Provisions of the Dirigo Health Act. P.L.2005, ch. 400 (effective Sept. 17, 2005); see L.D. 1577 (122nd Legis.2005); Comm. Amend. A to L.D. 1577, No. S-359 (122nd Legis.2005). Although this 2005 Act modified the process for calculating the savings offset payment, the new process continued to depend on the Board's determination of the "aggregate measurable cost savings." P.L. 2005, ch. 400, §§ A-10, A-11 (codified at

24–A M.R.S. § 6913(1)-(3)). To assist the Board in making this determination, the Act created a working group that would, among other things, propose to the Board of Directors a methodology for calculating the aggregate measurable cost savings by September 20, 2005. P.L.2005, ch. 400, § B–1(3)(D). To provide a balanced review of the issues, the working group was required to include "5 members representing the interests of insurers, self-insured entities and 3rd-party administrators and 5 members representing the interests of Dirigo Health." P.L.2005, ch. 400, § B–1(1). The working group was not created to provide ongoing assistance to the Board; rather, it was directed to complete its duties by December 31, 2005. P.L. 2005, ch. 400, § B–1(6).

[¶ 16] The 2005 Act and the statute it amended required the Board, after reviewing the working group's report, to hold a hearing, and determine and apply the proper methodology to calculate the aggregate measurable cost savings. 24–A M.R.S. § 6913(1)(A); P.L.2005, ch. 400, §§ A–10, B–1. The statute then required the Superintendent of Insurance to hold a public hearing to determine whether the savings calculated by the Board were reasonably supported by record evidence. 24–A M.R.S. § 6913(1)(C).[5]

C. Procedural History of this Case

[¶ 17] Beginning in June 2005, the newly constituted working group met and considered methods for calculating aggregate measurable cost savings for the first full year of the Dirigo Health program's operation. In late August 2005, the working group reported to the Board of Directors that, after considering possible methodologies for calculating aggregated measurable cost savings, it could not reach consensus. The working group, therefore, submitted two methodologies for the Board to consider, one from the "Dirigo Group"—the members appointed to represent Dirigo Health—and one from the "Payor Group"—the members appointed to represent the interests of insurers, third-party payors, and other payors.[6]

[¶ 18] The Dirigo Group's methodology included savings realized through provisions in the Act that were not explicitly connected to Dirigo Health's operation. Using its methodology, the Dirigo Group included savings resulting from multiple initiatives: hospitals' voluntary compliance with recommendations that they hold consolidated operating margins to no more than 3% and restrain cost per case mix adjusted discharge cost increases to no more than 3.5% for the 2003–2004 fiscal year pursuant to P.L.2003, ch. 469, § F–1(1)(B); carriers' voluntary limitation of product pricing to result in no more than a 3% underwriting gain, less federal taxes, for the 2003–2004 fiscal year pursuant to P.L.2003, ch. 469, § F–1(1)(C); the limitation on certificate of need costs based on the establishment of the capital investment fund pursuant to 2 M.R.S. § 102 and 22 M.R.S. § 335(1)(E), see P.L.2003, ch. 469, §§ B–1, C–8; and compliance with the recommendations of the Commission to Study Maine's Community Hospitals that the State resolve claims for past unreimbursed MaineCare costs, budget and pay past ob-

---

5. The Legislature adopted this procedure over a competing proposal that would have required the Superintendent of Insurance, rather than the Board, to determine the aggregate measurable cost savings. See Comm. Amend. B to L.D. 1577, No. S–360, § A–10 (122nd Legis.2005).

6. The record contains only a "Draft for Discussion Purposes Only" of the Payor Group's report to the Board. Because this is the only document in the record presenting the Payor Group's position, and because neither party requested that the record be modified to include any later draft, see M.R. Civ. P. 80C(f), we rely on the draft report in our analysis.

ligations in a timely manner, revise future periodic interim payment estimates to include a realistic forecast of MaineCare use increases, and increase MaineCare payments to physicians and hospitals to cover their costs, *see* P.L.2003, ch. 469, § F–3(1); Commission to Study Maine's Hospitals, Report to the Legislature 5 (Feb.2005).

[¶ 19] The Payor Group presented a methodology that would "measure changes in a hospital's approved charges over time." These changes would be measured based on a hospital's gross patient service revenue, the calculation of which would take into account a variety of factors, such as "changes in the hospital's expenses, the hospital's operating margin, the payments received by both public and private payors, and uncompensated care." The method for calculating the gross patient service revenue would, according to the Payor Group, take into account many of the measures of savings listed by the Dirigo Group, including measures other than those generated as a result of the operations of the Dirigo Health Agency or expansions in MaineCare eligibility, such as changes in hospital operating margins. The Payor Group expressly stated that these savings would include "many of the components that the Dirigo Health Agency proposal tries to measure separately."

[¶ 20] Although the Payor Group urged that the savings measured "must be directly attributable to the operation of Dirigo Health," it is apparent that the Group used the phrase "directly attributable" broadly. (Emphasis omitted.) The Payor Group proposed to measure changes in hospital expenses, operating margins, and public and private payments, and does not appear to have advocated that the savings be limited to those realized through the reduction of bad debt and charity care and the increase in MaineCare enrollment resulting from the 2004 eligibility expansion.

[¶ 21] The Board ultimately adopted the methodology proposed by the Dirigo Group. In so doing, the Board observed that the Dirigo Group's proposed methodology had been adjusted "to meet concerns of the Payor Group" before it was submitted to the Board. The Board then calculated aggregate measurable cost savings of $136.8 million for the first year of assessment, including $2.7 million in savings realized through avoidance of bad debt and charity care.

[¶ 22] Pursuant to section 6913(1)(B), the Board's determination was automatically submitted to the Superintendent of Insurance for review of the Board's calculation of aggregated measurable cost savings. At the outset, the Superintendent noted that he would not decide purely legal questions of statutory interpretation but would instead confine himself to the statutory requirement that he "approve the filing upon a determination that the aggregate measurable cost savings filed by the board are reasonably supported by the evidence in the record." 24–A M.R.S. § 6913(1)(C). He did not, therefore, expressly articulate an interpretation of section 6913(1)(A) regarding the types of savings that could be included in "aggregate measurable cost savings."

[¶ 23] As the Superintendent reviewed each measure of savings, however, he addressed whether the savings were realized as a result of the legislative initiative that purportedly generated the savings. For instance, the Superintendent reviewed the methodology for determining the case mix adjusted discharge and determined that it was "unreasonable to assume that any decrease over the base period is due to voluntary cost control while ignoring increases over the base period." He also adjusted the calculation of case mix adjusted discharge because its inflation adjustment was based on an outdated index. The Superintendent further disal-

lowed any savings realized through limiting consolidated operation margins because he found that "the filed savings [were] due to random fluctuations" that were *"unrelated to the Dirigo law."* (Emphasis added.)

[¶ 24] After similarly addressing each measure of savings found by the Board, the Superintendent approved only $43.7 million of the savings identified by the Board. Specifically, the Superintendent approved as aggregated measurable cost savings: $33.7 million realized through the cost per case mix adjusted discharge measures, *see* P.L.2003, ch. 469, § F–1(1)(B); $2.7 million attributable to reduced bad debt and charity care, *see* 24–A M.R.S. § 6913(1)(A); $1.5 million realized from accelerated payments of hospital settlement amounts, *see* P.L.2003, ch. 469, § F–3(1); $1.7 million realized by accelerating periodic interim payments, *see* P.L.2003, ch. 469, § F–3(1); and $4.1 million realized through increased physician payments, *see* P.L.2003, ch. 469, § F–3(1). The Superintendent expressly concluded that the record did not provide adequate support for the Board's findings of savings resulting from the operation of the capital investment fund to limit certificate of need expenditures, *see* 2 M.R.S. § 102; 22 M.R.S. § 335(1)(E), or from insurance carrier savings initiatives, *see* P.L.2003, ch. 469, § F–1(1)(C).

[¶ 25] The Association sought judicial review of the Superintendent's decision pursuant to 5 M.R.S. § 11002 (2006), 24–A M.R.S. § 236 (2006), and M.R. Civ. P. 80C(a).[7] The Association's Rule 80C complaint alleged, among other things, that some of the non-MaineCare-related items should not have been included in the ag-

gregate measurable cost savings because they did not result from the operation of Dirigo Health. The Association sought declaratory and injunctive relief, and "[s]uch further legal and equitable relief as may be necessary to effectuate the Court's decision herein."

[¶ 26] The Superior Court affirmed the decision of the Superintendent, deferring to the Board's interpretation of "aggregate measurable cost savings." 24–A M.R.S. § 6913(1)(A). The court concluded that the Board, acting in its area of expertise, had developed reasonable measures of cost savings realized as a result of the initiatives identified in the Act that created Dirigo Health. P.L.2003, ch. 469.

[¶ 27] The Association timely appealed to us from the Superior Court's judgment. The Consumers for Affordable Health Care Coalition, an intervenor in the Superior Court and a participant in the administrative proceedings, filed an amicus brief supporting the Superintendent's decision.

## II. DISCUSSION

### A. Decision Subject to Review

[¶ 28] When the Superior Court acts in an intermediate appellate capacity in reviewing the decision of an administrative agency, we directly review the agency's decision on appeal. *Hannum v. Bd. of Envtl. Prot.,* 2006 ME 51, ¶ 9, 898 A.2d 392, 396. Here, the decision that is directly on appeal is the decision of the Superintendent of Insurance. Specifically, the Association challenges the Superintendent's approval of savings that fell into categories other than savings attributable to reductions in bad debt and charity care or expansions in MaineCare eligibility.[8]

---

7. Separate appeals were filed by the trusts, No. AP–05–95, and the Chamber of Commerce, No. AP–05–96, but they were consolidated with the Association's appeal, No. AP–05–90, and the Chamber, the trusts, and the

Association filed one joint brief in their appeal to us.

8. Although the Association indicated that there may be other savings that directly result from the operation of Dirigo Health, it did not

[¶ 29] Although the Association appealed to the Superior Court from the Superintendent's decision, the parties agree that the Board, rather than the Superintendent, initially construed section 6913(1)(A) to determine which categories of savings should be included. The Superintendent accepted, at least theoretically, the Board's interpretation as to which categories of savings were included as aggregate measurable cost savings and reviewed whether the evidence supported the Board's calculations within each category. Accordingly, although the Superintendent reviewed the Board's calculations in each category of savings, because the Superintendent utilized the Board's interpretation of section 6913 to identify the categories of savings, and because neither party has challenged the Superintendent's review of these calculations, we review the Board's statutory construction because it provided the underpinning of the decision made by the Superintendent.

## B. Interpretation of Section 6913(1)(A)

[¶ 30] The parties have, in essence, narrowed the question on appeal to this: Did the Board reasonably interpret section 6913(1)(A) to include the broader savings derived from the operation of the Act To Provide Affordable Health Insurance, rather than limiting the aggregate measurable cost savings to those savings directly derived from the operation of Dirigo Health and those savings realized through increased enrollment in MaineCare due to the 2004 eligibility expansion?

[¶ 31] The calculation of the savings amount and the methodology for this calculation are, however, more complex than this question would suggest. At various times, interested parties representing both Dirigo Health *and* the payors have anticipated the measurement of savings from a fairly broad set of cost reductions.

identify any specific savings of this sort con-

[¶ 32] Our task, therefore, is to determine whether the Board exceeded its authority or erred as a matter of law in determining the meaning of the phrase "aggregate measurable cost savings" and in creating a methodology to implement that interpretation. As always, we first determine whether the plain, unambiguous meaning of the statute controls the outcome. *See Arsenault v. Sec'y of State*, 2006 ME 111, ¶ 11, 905 A.2d 285, 288. If the meaning of the statute is ambiguous, we will uphold the agency's interpretation in its field of expertise "unless the statute plainly compels a contrary result." *Hannum*, 2006 ME 51, ¶ 9, 898 A.2d at 396 (quotation marks omitted). That is, we will uphold the agency's interpretation in these circumstances as long as the interpretation is reasonable. *See Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 13, 896 A.2d 271, 275.

### 1. Summary of Conclusions

[¶ 33] Before discussing in detail our review of the Board's interpretation of the statute, we summarize our conclusions. We decline to disturb the Superintendent's decision affirming, in part, the Board's determination because the Board (1) interpreted an ambiguous statute, (2) acted within its field of expertise, and (3) reasonably interpreted the ambiguous statute. First, we conclude that the statute is ambiguous because it fails to define the term "aggregated measurable cost savings" and there exists neither a commonly understood definition of the phrase nor a readily apparent dictionary or other definition of the phrase. 24–A M.R.S. § 6913(1)(A). Second, we conclude that the Board has authority in this field of law. The Legislature recognized the need to develop methods of calculation and selected the Board to make this difficult determination.

nected to the year in question.

Third, we conclude that the Board's interpretation, as implemented by the Superintendent, is reasonable, especially given that those representing the payors in the working group originally anticipated the inclusion of savings resulting from the broader Act.

### 2. Review of the Board's Statutory Interpretation

#### a. Statutory Ambiguity

[¶ 34] We begin with the basic formulations of our standards of review and the canons of statutory interpretation. Our primary purpose in interpreting a statute is to give effect to the intent of the Legislature. *Arsenault*, 2006 ME 111, ¶ 11, 905 A.2d at 288. If a statute is unambiguous, we interpret the statute according to its plain language. *Id.*

[¶ 35] A statute is ambiguous if it is "reasonably susceptible of different interpretations." *Batchelder v. Realty Res. Hospitality, LLC,* 2007 ME 17, ¶ 17, 914 A.2d 1116, 1123 (quotation marks omitted). In other words, if a statute can reasonably be interpreted in more than one way and comport with the actual language of the statute, an ambiguity exists.

[¶ 36] With these principles in mind, we turn to the statute at issue. The statute creates, but does not define, the term "aggregate measurable cost savings":

> After an opportunity for a hearing … the board shall determine annually not later than April 1st the aggregate measurable cost savings, including any reduction or avoidance of bad debt and charity care costs to health care providers in this State as a result of the operation of Dirigo Health and any increased Maine-Care enrollment due to an expansion in MaineCare eligibility occurring after June 30, 2004.

24–A M.R.S. § 6913(1)(A).

[¶ 37] The term "aggregate measurable cost savings" is not defined elsewhere in the chapter on Dirigo Health. *See* 24–A M.R.S. § 6903 (2006) (providing definitions of other terms). Nor is it defined or even discussed in the statutes encompassed in the original Act To Provide Affordable Health Insurance. P.L.2003, ch. 469. It is not defined in rules promulgated by the Board. There is no common understanding of the term, and the parties do not assert that it is a term of art with inherent meaning in the field of health care law. Thus, purely from the use of a new phrase and the absence of a statutory definition, we can determine that the statute is ambiguous. Reasonable people disagree on its meaning and more than a plain reading of the language itself is necessary to determine that meaning.

[¶ 38] Nonetheless, the Association argues that section 6913 unambiguously requires that savings other than those expressly included by the statute must have been realized "as a result of the operation of Dirigo Health." 24–A M.R.S. § 6913(1)(A). It is critical to look carefully at the language of section 6913(1)(A) to understand the dispute. The statute provides that the Board must determine "the aggregate measurable cost savings, including any reduction or avoidance of bad debt and charity care costs to health care providers in this State *as a result of the operation of Dirigo Health* and any increased MaineCare enrollment due to an expansion in MaineCare eligibility occurring after June 30, 2004." *Id.* (emphasis added). From this language, the payors argue that the phrase "as a result of the operation of Dirigo Health" modifies not "reduction or avoidance of bad debt and charity care costs," but "aggregate

measurable cost savings." To make this argument, they are forced to ignore three critical grammatical elements in the sentence: (1) the placement of the phrase "as a result of the operation of Dirigo Health," (2) the comma that follows "aggregate measurable cost savings" and precedes "including," and (3) the absence of a comma before the phrase "as a result of the operation of Dirigo Health and any increased MaineCare enrollment due to an expansion in MaineCare eligibility." Moreover, the cost savings generated by the operation of Dirigo Health are described as "including" the savings arising from reductions in bad debt and charity care and the expansion of MaineCare coverage, rather than being *limited to* these measures of savings. *Id.; see S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 16, 868 A.2d 210, 216, *aff'd*, ─ U.S. ─, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006) ("The common definition of the word *includes* does not suggest it is a word of limitation.").

[¶ 39] Thus, the grammatical construction of the statute supports a reading that interprets the phrase "as a result of the operation of Dirigo Health" to modify the immediately preceding noun: "reduction or avoidance of bad debt and charity care costs." 24–A M.R.S. § 6913(1)(A). Indeed, much of the pre-enactment discussion in the Legislature was directed at the hope and anticipation for the reduction of bad debt and charity care costs directly resulting from "the operation of Dirigo Health." [9] *Id.* Thus, reading the sentence without the grammatical strain urged by the Association makes sense in the context of the Act within which it was enacted.

[¶ 40] Although the Association argues that the important determination before us should not turn on the use of commas in the statute, its rejection of the ordinary rules of statutory construction has demonstrated only that there is another, possibly reasonable, interpretation of the statute. That is the classic definition of ambiguity. We are not persuaded that the statute unambiguously requires the limitation the Association suggests.

[¶ 41] In sum, we conclude that the statute is ambiguous for several reasons: (1) as we described above, the Legislature created a new phrase, "aggregate measurable cost savings," without providing a definition of the types of cost savings the term encompasses; (2) the Legislature left the definition open-ended by using the word "including," rather than words of limitation such as "limited to" or "consisting of"; and (3) the statute may be read to include cost savings encompassed in the broader Act within which Dirigo Health was created, or it may be read more narrowly to include only savings realized through the operation of Dirigo Health and expanded MaineCare enrollment.

b. Deference to the Authority of the Board

[¶ 42] The next question presented is whether we can or should defer to the expertise of the Board in interpreting the ambiguous phrase. That question requires us to determine whether the Board was acting within its realm of expertise. Here, we are guided by the authority conferred on the particular agency by the Legislature. When an agency is created contemporaneously with a statute and is given the authority to implement a new statutory scheme at that time, we will defer to that agency's reasonable interpretation of an ambiguous statute. *See Ga.-Pac. Corp. v. State Tax Assessor*, 562 A.2d 672, 674 (Me.1989) (stating that an agency's interpretation is especially persuasive when the interpretation is "contemporane-

---

9. We discuss the legislative history of the Act To Provide Affordable Health Insurance in greater detail below in section II(B)(2)(c) of this opinion.

ous with the statute" (quotation marks omitted)). Further, when the Legislature has expressly imposed upon an agency the duty to make a statute operative, the agency's construction of the statute is entitled to great deference. *Id.* (citing *Kelley v. Halperin,* 390 A.2d 1078, 1080 (Me.1978)).

[¶ 43] Here, the Legislature explicitly established the Board to supervise the operations of Dirigo Health. 24–A M.R.S. § 6904 (2006). The members of the Board must meet particular qualifications that require expertise in health-care-related fields or in state management and budgeting, 24–A M.R.S. § 6904(1), (2)(A); they must avoid identified conflicts of interest, *id.* § 6904(2)(B); and they are immune from liability in carrying out their supervisory functions, 24–A M.R.S. § 6905 (2006).

[¶ 44] Accordingly, we will defer to the Board's interpretation of the ambiguous statute if the interpretation is reasonable because the Board was created contemporaneously with the Act and the Legislature expressly directed it to perform the task of determining the aggregate measurable cost savings realized during Dirigo Health's first assessment year. *See Ga.-Pac. Corp.,* 562 A.2d at 674.

[¶ 45] In our review, we are mindful that the Board acts for an agency created and governed entirely by the Legislature. Because the Board acts within the confines of a broader statutory scheme to administer a highly specialized, legislatively created agency, we are particularly reluctant to disrupt the interpretations of law reached by the Board. We have exercised similar restraint in the field of workers' compensation law, recognizing that legal determinations are often inextricably linked to the Legislature's policy goals. *See Am. Mut. Ins. Cos. v. Murray,* 420 A.2d 251, 252

(Me.1980). Thus, the Board is an agency whose interpretation of a statute it administers is entitled to deference from the courts if the statute is ambiguous and the Board's interpretation is reasonable.

[¶ 46] Accordingly, we next examine whether the Board acted reasonably in construing the ambiguous language of section 6913(1)(A) in light of its legislative history, or whether the statute, viewed in the context of its adoption and amendment, compels a narrower interpretation. *See Cyr v. Madawaska Sch. Dep't,* 2007 ME 28, ¶ 9, 916 A.2d 967, 970; *Hannum,* 2006 ME 51, ¶ 9, 898 A.2d at 396; *Cobb,* 2006 ME 48, ¶ 13, 896 A.2d at 275.

c.  Reasonableness of the Board's Interpretation

[¶ 47] We begin by examining evidence of legislative intent. *See Cyr,* 2007 ME 28, ¶ 9, 916 A.2d at 970. The pronouncements of the legislators during their initial consideration of the Act demonstrate that, although they did not attempt to define or limit the definition of "aggregate measurable cost savings," they focused on what they initially believed would generate the greatest cost savings: reduction in the costs associated with bad debt and charity care.

[¶ 48] Indeed, it is fairly clear that in their initial discussion of funding sources for the Dirigo Health program, the Governor's office and legislators focused almost entirely on the savings expected to be generated by the reduction of bad debt and charity care. It is also apparent that, in those initial discussions, the two savings mechanisms—the expansion of MaineCare and the reduction of bad debt and charity care costs—were sometimes viewed as the *exclusive* sources of funding for Dirigo.[10]

---

10.  For example, the lead Senate sponsor of the initial Act To Provide Affordable Health Insurance, Senate Majority Leader Sharon Anglin Treat, submitted testimony to the Joint Select Committee on Health Care Reform communicating her understanding of the funding for the Agency:

[¶ 49] This focus on anticipated reductions in bad debt and charity care was also evident in a narrative summary entitled "Dirigo Health: Health Reform for Maine," through which the Governor supplemented his proposed health reform legislation.[11] This publication primarily focused on recouping savings realized through the reduction or elimination of bad debt or charity care, without specifically mentioning other measures of cost savings. First, in the summary, the document listed the pooling of financial resources to finance Dirigo Health as a strategy to address access to health care:

*Pool Resources to Finance Dirigo Health*

Assistance for Maine residents up to 300% of poverty will be financed by pooling individuals and small businesses, by pooling contributions from employers, individuals, state and Federal funds and by recovering and redirecting 60% of the funds currently spent on bad debt and charity care. By pooling these resources, access can be achieved without new state appropriations.

Gov. John Elias Baldacci, Dirigo Health: Health Reform for Maine 4 (May 5, 2003). Second, in explaining the funding, the document stated,

[Dirigo Health] will recapture some of the reduced bad debt and charity care write offs for Maine providers that re-

sult from reducing the number of uninsured Mainers. Currently we estimate that a conservative estimate of the level of bad debt and charity care costs across all providers that is available for "recovery" is $164 million . . . .

*Id.* at 27. In discussing the Act's approach to reducing cost shifting, the document explicitly identified the recovery of savings resulting from the reduction or elimination of charity care and bad debt:

This proposal seeks to recover bad debt and charity care funds from the "back end" of care and reinvest them in the front end of coverage to provide health insurance for the uninsured. However . . . we will not recover all bad debt and charity care, rather, we anticipate a recovery rate of 60%. If "universal" coverage is provided to all eligible persons, this rate represents $164 million in savings.

*Id.* at 58.

[¶ 50] In addition, the Director of the Governor's Office of Health Policy and Finance submitted testimony to the Joint Select Committee on Health Care Reform in which she discussed as savings exclusively those savings realized through reductions in bad debt and charity care:

[U]ninsured citizens seek care only when no other option is available—at

We all will share in funding this plan, and we will all benefit—the uninsured will be able to purchase comprehensive, affordable insurance; small businesses can control their health insurance costs and offer a valuable benefit to employees; and hospitals and insurers are relieved of significant "bad debt" due to lack of coverage.
. . . [T]he plan pools a variety of resources, relying on:
● Individuals and small business who will pay premiums and co-payments based on their ability to pay;
● Insurance companies who will pay "up front" for less expensive preventive health care, rather than the more expen-

sive "bad debt and charity care" frequently provided to the uninsured and underinsured in hospitals. These unpaid costs simply are added to the bills of those who have insurance and can afford to pay.
● Additional federal dollars will flow into the system by providing coverage to low-income workers—without the need for waiver approval.

11. Although the breadth of this document's dissemination is not evident from the legislative record, the document does inform us of the sponsors' intentions in offering the bill to the Legislature.

late and costly stages of disease. Hospitals and other providers care for them at no charge, then raise their rates to cover the losses associated with that care. Those increased rates are charged to insurance premiums in the form of a cost shift that all of us pay. As a result, there is today $275 million *already in the system* that covers bad debt and charity care to pay for the uninsured when they get sick. We propose to reinvest less than a third of that money to help pay for health insurance coverage including coverage for prevention and primary care, for all Maine's uninsured.

Consistent with these initial discussions, in response to questions posed to the Governor's office by the Committee, the Governor's office indicated that the reduction in bad debt and charity care would generate savings and did not list other measures of savings:

> Why is the proposal funded solely from a tax on insurers and not a broader funding mechanism?

> The purpose of the assessment is to recover bad debt and charity care now implicit in prices. It makes sense to remove this directly from prices via insurer negotiation with providers, rather than adding to a complex system of offsets (as would be the case with a more diversified assessment or any assessment on providers).[12]

[¶ 51] After considering the initially proposed legislation, L.D. 1611 (121st Legis.2003), and receiving additional testimony and information, the Joint Select Committee on Health Care Reform submitted Committee Amendment A to the Act To Provide Affordable Health Insurance, Comm. Amend. A to L.D. 1611, No. H–565 (121st Legis.2003). This amendment replaced the initial Act, and the Legislature ultimately adopted this amendment. *See* P.L.2003, ch. 469.

[¶ 52] The summary to Committee Amendment A also focused on the recovery of savings due to reductions in bad debt and charity care:

> In the first year of operation, funding for Dirigo Health is provided through the General Fund. After July 1, 2005, funding for subsidies and the Maine Quality Forum must be provided through savings offset payments paid by health insurance carriers, employee benefit excess insurance carriers and third-party administrators. The board of directors is required to establish the savings offset amount, not to exceed 4% of annual premium revenue or its equivalent, on an annual basis and those savings offset payments may not exceed the aggregate cost savings attributable to reductions in bad debt and charity care costs as a result of the operation of Dirigo Health and the expansion in MaineCare.

---

12. In further explanation, the Governor's office responded:

> A reduction in providers' bad debt and charity care experience would relieve the need to inflate rates to recover these costs from those who pay for care. One objective of Dirigo Health Insurance is to provide currently un-and underinsured individuals with comprehensive coverage, thus reducing the level of bad debt and charity care in the system. While service rates moderate to reflect declining costs, premium levels will remain at levels which continue to reflect the very same costs. The reimbursement rates paid by insurers will not incorporate the cost of bad debt and charity care, but the premiums paid by rate payers will, resulting in a windfall to insurers (most of which, in Maine, are for profit organizations).
>
> The recovery against insurers is intended to avoid that scenario, using a strategy that is easy to implement and track.

Comm. Amend. A to L.D. 1611, No. H–565, Summary (121st Legis.2003). Representative Kevin Glynn, who supported Committee Amendment A, echoed this understanding that the amount of the offset would be limited to the amount saved by reducing the amount of bad debt and charity care:

> The language in the bill is intended to set a maximum amount that this tax can ever be assessed at 4 percent. However, which is important, is the tax that will be assessed up to that maximum cap will never be greater than the bad debt and charity care that are actually going to be realized by both the hospitals and doctor's offices, that is then realized by the insurance carriers, which then will offset that tax.

2 Legis. Rec. H–985, H–995 (1st Reg. Sess.2003).

[¶ 53] Thus, as initially enacted, the Act's legislative history indicates that aggregate measurable cost savings were understood to be generated primarily by reductions in bad debt and charity care along with any related savings resulting from expansions in MaineCare eligibility.

[¶ 54] By the next legislative session, however, the Legislature had become concerned about how to address the undefined term "aggregate measurable cost savings." Certain legislators began to voice questions about the scope of savings included in the term, as well as the limited extent of the savings to be found in reducing bad debt and charity care. To address these uncertainties, two proposals were presented to the Legislature. The proposal that was ultimately enacted created a working group to make recommendations to the Dirigo Health Board of Directors, which would then determine the method for calculating aggregate measurable cost savings, subject to the approval of the Superintendent of Insurance. Comm. Amend. A to L.D. 1577, No. S–359 (122nd Legis.2005); P.L.2005, ch. 400, §§ A–10, B–1. The alternative proposal would have placed the determination of aggregate measurable cost savings in the hands of the Superintendent of Insurance instead of the Dirigo Health Board of Directors. Comm. Amend. B to L.D. 1577, No. S–360, § A–10 (122nd Legis.2005).

[¶ 55] Senator Peter Mills, a proponent of the amendment that would have required the Superintendent to determine the aggregate measurable cost savings, specifically identified the problem created by the ambiguity of the term "aggregate measurable cost savings." He warned that the savings resulting from reductions in bad debt and charity care could be "miniscule," and that the program directors might "take credit for" a substantial set of cost savings initiatives connected to the broader application of the Act To Provide Affordable Health Insurance:

> The original theory of the Dirigo product was that by taking people off the uninsured list and giving them insurance that this would save on bad debt and charity care. I have no doubt that there will be some small measure of savings arising from the sale of this product to people who are uninsured. I believe that this savings will be miniscule. *Because it is miniscule, I understand that the directors of Dirigo plan to take credit for, and maybe they should, other initiatives of the Dirigo program in a broader context.* One of the awkward things in our discussion is that the Dirigo label is used not just for the health product, which is one initiative, but also for a whole set of government initiatives in the field of healthcare; the new controls over certificate of need, the efforts to gain control over hospital costs, and to gain voluntary compliance to limits on the growth in healthcare expenses.

—— Legis. Rec. S–1238 (1st Spec. Sess.2005) (emphasis added).

[¶ 56] With the growing legislative understanding that the bad debt and charity care savings might not be as extensive as originally expected, differing opinions emerged regarding how broadly to interpret section 6913(1)(A) to determine what other savings were properly included as part of the aggregate measurable cost savings. This evolving legislative awareness that the term could or should include measures of savings resulting from initiatives in the broader Act To Provide Affordable Health Insurance resulted in a call for clarification of the original legislation.

[¶ 57] Ultimately, to address the lingering question regarding the nature of the savings that should be included in the calculation of aggregate measurable cost savings, the Legislature created the working group to assist the Board in formulating an appropriate methodology to determine both what types of cost savings are included in aggregate measurable cost savings and how the savings should be calculated within each type of cost savings.[13] P.L. 2005, ch. 400, § B–1. The legislation directed that the working group, composed of members representing the various interests involved, would make recommendations to fill in the gaps existing in the statute where further description and definition were required. *Id.* § B–1(1), (3)(D). The Legislature left the Board with the authority to interpret the statutory term "aggregate measurable cost savings" after considering the recommendations of the working group. 24–A M.R.S. § 6913(1)(A); P.L.2005, ch. 400, § B–1(3)(D).

[¶ 58] Nothing in this legislative history renders the Board's interpretation of "aggregate measurable cost savings" to include broader savings unreasonable. To the contrary, the Legislature obviously recognized the difficulty of making the determinations necessary to devise a method and calculate the aggregate measurable cost savings, and it created the position-balanced working group with the goal of reaching consensus. When that consensus could not be achieved, it was not unreasonable for the Board to interpret aggregate measurable cost savings to incorporate savings realized through the set of government initiatives that comprised the Act To Provide Affordable Health Insurance.[14]

[¶ 59] On this record, we cannot conclude that the Board acted unreasonably in interpreting aggregate measurable cost savings to include savings that were realized through the broader Act that created Dirigo Health, or that the Superintendent erred in approving those savings supported by evidence in the record.

### III. CONCLUSION

[¶ 60] Although reasonable people may, and do, disagree with the Board, the Legislature conferred broad authority on the Board to implement the Act, and the Board's interpretation is based on the rational position that the term "aggregate measurable cost savings" may include cost savings realized through the implementation of the full Act To Provide Affordable Health Insurance. Because section 6913 and its legislative history do not clearly indicate a contrary intention, they do not compel a narrower interpretation. *See Hannum,* 2006 ME 51, ¶ 9, 898 A.2d at

---

**13.** In the matter before us, only the types of savings are at issue, as no party has contested the Superintendent's decision regarding the amount calculated in each category.

**14.** We recognize, as the dissent has pointed out, that the Legislature delegated substantial authority to the Board. No party has challenged that delegation, and we do not opine further on this issue.

396. Rather, viewing the statute in context, the inclusion of savings from the broader Act is reasonable given the unity of the creation of Dirigo Health with the Act To Provide Affordable Health Insurance. *See York Ins. of Me., Inc. v. Superintendent of Ins.*, 2004 ME 45, ¶ 14, 845 A.2d 1155, 1159 (stating that we consider the entire statutory scheme as a whole when interpreting a statute). We therefore defer to the Board's interpretation and affirm the Superior Court's judgment affirming the decision of the Superintendent.

The entry is:

Judgment affirmed.

ALEXANDER, J., dissenting.

[¶ 61] The Court's opinion thoroughly and accurately addresses the law and the legislative history that governs our review of the subsidy for the Dirigo Health program, and calculation of the "aggregate measurable cost savings" described in 24-A M.R.S. § 6913(1)(A) (2006).

[¶ 62] I concur in those aspects of the opinion that recognize that (1) the executive proponents and legislative drafters of Dirigo Health intended that the "cost savings" to be charged to health insurers and their consumers as "offset payments" would be those bad debt and charity care costs avoided as previously uninsured individuals became insured by Dirigo Health; (2) after Dirigo Health was enacted, concern was expressed that cost savings from bad debt and charity care costs avoided would not support the subsidy the program would require; (3) these concerns did not result in change to the operative provisions of the original legislation; (4) "aggregate measurable cost savings" is an undefined and ambiguous term for which "we find no substantive guidance through precedent," Court's Opinion ¶ 2; (5) the Legislature delegated to the Board of Directors of Dirigo Health and the Superin-

tendent of Insurance the authority to interpret this ambiguous term; and (6) the result of this delegation was an offset payment assessment nearly twenty times higher than that originally contemplated by the executive proponents and legislative drafters of Dirigo Health.

[¶ 63] I differ with the Court's opinion only in its ultimate conclusion that the ambiguity in the law must be resolved by delegating and deferring to the administrative agency, giving the agency license to assess offset payments according to whatever definition of "cost savings" the agency deems appropriate to meet its financial needs. From that conclusion, I respectfully dissent.

[¶ 64] The funding scheme to subsidize Dirigo Health authorizes its self-interested Board of Directors to decide how much money they want to spend, call that amount "cost savings," and then require payment of that sum as "savings offsets" by other health insurers and their consumers. The "cost savings" identified by the Dirigo Board included increased State payments to hospitals for past due MaineCare bills, increased MaineCare payment rates for physicians, and economic projections that hospitals might voluntarily reduce cost increases. Calling payments of past due bills and increased MaineCare payment rates "savings" gives new meaning to the term. Common sense dictates that when you spend money, you do not save money.

[¶ 65] For the first assessment year, the Dirigo Board decided that health insurers and their consumers should be charged $136.8 million in such savings offsets to subsidize Dirigo Health. This was a subsidy of more than $10,000 per person, per year for each of the approximately 13,000 persons who became insured by Dirigo Health. The Superintendent of Insurance pared this savings offset back to $43.7

million, or about a $3000 per year subsidy for each person covered by Dirigo Health.

[¶ 66] Review of the Superintendent's decision indicates significant difficulty in rationally distinguishing between those "cost savings" that the Superintendent excluded and those that he allowed to reduce the Dirigo Health subsidy from $136.8 million to $43.7 million. This difficulty in distinguishing between included and excluded cost savings derives from the ambiguous and undefined terminology in section 6913(1)(A).

[¶ 67] The "cost savings" sought by the Dirigo Board and allowed by the Superintendent included $2.7 million in bad debt and charity care avoided by the operation of Dirigo Health. No one disputes that this sum may be assessed as a savings offset. As the Court's opinion ably points out, this is the real dollar savings that the program's proponents originally argued would result to justify the savings offset subsidy from health insurers and their consumers to support Dirigo Health.

[¶ 68] The remaining $41 million in "cost savings" approved by the Superintendent are not the real dollar savings predicted by the program proponents, but fanciful characterizations of spending as "savings," and hoped for reductions in the rate of hospital cost increases, characterized as "savings" based on the ambiguous "aggregate measurable cost savings" term in the statute. While that $41 million is based on no identified real dollar savings caused by Dirigo Health, it results in real dollar charges to health insurers and their consumers. With commendable candor, the proponents of Dirigo Health conceded at oral argument that the program is raising the cost of health insurance for most Mainers covered by health insurance.

[¶ 69] The fact that the Dirigo Health Board of Directors and the Superintendent of Insurance could arrive at such dramatically different figures for "aggregate measurable cost savings" demonstrates the significant ambiguity of the term and the highly subjective, judgmental analysis it invites the Board and the Superintendent to use in determining the savings offset charge. The Court's opinion thoroughly discusses the problems this ambiguity creates and the administrative attempts to resolve it. However, the recognized ambiguity in the statute and its reliance on subjective and judgmental decision making cannot be resolved by delegation and deference to the agencies charged with administration of the law, here, the Dirigo Health Board of Directors and the Superintendent of Insurance.

[¶ 70] We have regularly said that, in resolution of ambiguities in statutes, we defer to the agency charged with administration of the law, and that as long as the interpretation the agency adopts is a reasonable one, the actions the agency takes in accordance with that reasonable interpretation will be affirmed. *See S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶¶ 4–5, 868 A.2d 210, 213–14, *aff'd* —— U.S. ——, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006). However, that deference has its limits.

[¶ 71] When terminology in a statute is so vague and ambiguous that those regulated must guess at its meaning, and an agency is given license to act based on preferences or criteria so subjective that they are virtually unreviewable, we have held that such subjective license is an improper delegation of legislative authority to the executive. *See Kosalka v. Town of Georgetown*, 2000 ME 106, ¶ 17, 752 A.2d 183, 187 (holding that a regulatory standard that is "an unmeasurable quality, totally lacking in cognizable, quantitative standards" renders that standard "an unconstitutional delegation of legislative authority and violative of the due process clause"); *see also City of Portland v. Ja-*

*cobsky,* 496 A.2d 646, 649 (Me.1985) (holding a regulatory requirement improperly vague when it was stated "in terms so vague that people of common intelligence must guess at its meaning"); *Me. Real Estate Comm'n v. Kelby,* 360 A.2d 528, 531 (Me.1976) (holding that a statute is void for vagueness when it forces people "of general intelligence to guess at its meaning, leaving them without assurance that their behavior complies with legal requirements and forc[es] courts to be uncertain in their interpretation of the law" (quotation marks omitted)).

[¶ 72] The unfathomable ambiguity of the "cost savings" provision in section 6913(1)(A) is rather dramatically demonstrated here when the original proponents' interpretation of the "cost savings" provision would generate a $2.7 million savings offset charge, the Dirigo Board, charged with administration of the law, interpreted the same provision to justify a $136.8 million savings offset charge, and the Superintendent of Insurance, reviewing the Board's determination interpreted the same provision to support a $43.7 million savings offset charge. Reasonable people do differ, and differ geometrically, in guessing at the meaning of the "cost savings" provision. And the statute provides no guidance as to how these differences may be resolved.

[¶ 73] Article III of the Maine Constitution imposes a strict separation of powers, reserving specific authority to the Executive Branch, to the Legislature, and to the Judiciary. *See Bossie v. State,* 488 A.2d 477, 480–81 (Me.1985). Our constitution reserves to the Legislature the authority to raise revenues and decide what funds can be spent to promote the public good. ME. CONST. art. I, § 22; *see Boston Milk Producers Inc. v. Halperin,* 446 A.2d 33, 40–41 (Me.1982) (holding that the Legislature "unconstitutionally surrendered its power of taxation" when it delegated to one group of citizens the power to increase another group's taxes); *see also Morris v. Goss,* 147 Me. 89, 107–08, 83 A.2d 556, 566 (1951) (holding that, absent constitutional authorization, the power to tax rests exclusively with the Legislature). That authority cannot be delegated to the Executive Branch without very specific guidance, requiring that any assessment to be made by the Executive Branch, rather than the Legislature, is within an identifiable range necessary to achieve a defined public purpose, such as regulation or promotion of a particular activity or profession—an area of frequent legislative delegation of fee setting authority. *See Bd. of Overseers of the Bar v. Lee,* 422 A.2d 998, 1004 (Me. 1980), *appeal dismissed,* 450 U.S. 1036, 101 S.Ct. 1751, 68 L.Ed.2d 233 (1981); *see generally State v. Lasky,* 156 Me. 419, 165 A.2d 579 (1960) (finding constitutional tax statute meant to raise funds for the benefit of the shellfish industry).

[¶ 74] No legislative guidance for assessing and spending is provided by the undefined "cost savings" term in the Dirigo Health legislation. That lack of guidance cannot be resolved by a deferential standard of judicial review of agency action that gives license to the agency to treat spending as if it were savings in order to assess and spend as it wishes. I would hold that an improper delegation of legislative authority occurred here, giving license to the Board of Directors of Dirigo Health to identify as "aggregate measurable cost savings" not only identifiable real dollar savings, but also projected or even imagined savings based on economic estimates and unquantifiable predictions of the future economics of health care in areas that have nothing to do with Dirigo Health or state-subsidized insurance generally.

[¶ 75] The Legislature may, out of necessity, implement its taxing and spending authority based on economic estimates and predictions of future revenues. However,

it cannot delegate to the Executive Branch the authority to raise revenues and impose costs, unlimited by any objective standards by which the Executive Branch's observance of its delegated authority from the Legislature may be judged. Before the Board of Directors of Dirigo Health and the Superintendent of Insurance can be permitted to impose savings offset payment requirements upon health insurers that have the effect of raising the cost of health insurance to consumers, more specific criteria must be enacted to guide the identification of cost savings and permit review of agency action based on something more than the agency's exercise of subjective judgment reliant on economic projections and predictions. Accordingly, I would vacate the judgment of the Superior Court affirming the decision of the Superintendent of Insurance.