MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2018 ME 83
Docket:      BCD-17-490
Argued:      May 15, 2018
Decided:     June 28, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

WAWENOCK, LLC, et al.

v.

DEPARTMENT OF TRANSPORTATION

GORMAN, J.

[¶1]  Wawenock, LLC; Bermuda Isles, LLC; 48 Federal Street LLC; and 32 Middle Street LLC (collectively, the LLCs) appeal from a judgment on the pleadings entered in the Business and Consumer Docket (*Mulhern, J.*) in favor of the Department of Transportation on the LLCs' complaint seeking declaratory and injunctive relief regarding the Department's plan to widen Route 1 in Wiscasset.  The LLCs argue that the court erred by determining that the Sensible Transportation Policy Act (STPA), 23 M.R.S. § 73 (2017), affords them no private right of action.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  On February 14, 2017, the LLCs—four entities that own property in Wiscasset—instituted the present litigation in the Superior Court (Lincoln

2

County)[1] against the Department, seeking declaratory and injunctive relief regarding the "Wiscasset Downtown Improvement Project" (the Project) for the widening and alteration of Route 1/Main Street in Wiscasset.[2] By amended complaint, the LLCs advanced nine counts claiming that the Department violated various constitutional, statutory, regulatory, and municipal provisions in planning and designing the Project. In particular, in Count 1, the LLCs alleged that the Department violated the STPA by failing to allow public participation in the planning and design of the Project.[3]

[¶3] The Department moved for a judgment on the pleadings pursuant to M.R. Civ. P. 12(c), arguing that the complaint was nonjusticiable on a variety of grounds. By judgment dated September 11, 2017, the court granted the motion and entered a judgment on the pleadings in favor of the Department on all counts. As to Count 1, the court concluded that the STPA affords no private right of action and that the LLCs were therefore precluded from seeking relief

---

[1] The matter was accepted by the Business and Consumer Docket on the LLCs' request. *See* M.R. Civ. P. 131.

[2] The LLCs named the Town of Wiscasset as a party in interest. The Town participated in the proceedings before the trial court but takes no position in this appeal.

[3] The LLCs also alleged in Count 1 of the complaint that the Department violated 23 M.R.S. § 651 (2017), but they do not pursue that argument in this appeal and we do not address it further.

on that basis. The LLCs appeal from the denial of their motion for reconsideration.[4] *See* M.R. Civ. P. 7(b)(5), 59(e).

## II. DISCUSSION

[¶4] The LLCs challenge only that portion of the court's judgment determining that the STPA affords them no private right of action and entering a judgment on the pleadings as to Count 1 on that basis. When, as here, a motion for a judgment on the pleadings is filed by the defendant pursuant to M.R. Civ. P. 12(c), "only the legal sufficiency of the complaint is tested." *Cunningham v. Haza*, 538 A.2d 265, 267 (Me. 1988). In such circumstances, the "[d]efendant's motion for judgment on the pleadings is nothing more than a motion under M.R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted." *Cunningham*, 538 A.2d at 267. We review the grant of a judgment on the pleadings de novo, *Faith Temple v. DiPietro*, 2015 ME 166, ¶ 26, 130 A.3d 368, by "assuming that the factual allegations are true, examining the complaint in the light most favorable to plaintiff, and ascertaining whether the complaint alleges the elements of a cause of action or facts entitling the plaintiff

---

[4] While the appeal was pending, the LLCs filed a motion for a preliminary injunction seeking an order enjoining the Department from commencing construction on the Project pending the outcome of the appeal. We denied the motion after oral argument based on the LLCs' failure to demonstrate a likelihood of success on the merits of their appeal. *See Bangor Historic Track, Inc. v. Dep't of Agric.*, 2003 ME 140, ¶ 9, 837 A.2d 129.

4

to relief on some legal theory," *Cunningham*, 538 A.2d at 267 (quotation marks omitted).

[¶5]  The sole issue before us is whether the STPA provides for a private right of action such that the LLCs may seek its enforcement through the court. A statute may provide for a private right of action by express language or by implication.  *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 101 (Me. 1984).

[¶6]  When a private right of action exists, however, it is most often created by express language: "[I]f our Legislature had intended that a private party have a right of action . . . , it would have either expressed its intent in the statutory language or legislative history or, more likely, expressly enacted one." *Id.*; *see In re Wage Payment Litig.*, 2000 ME 162, ¶ 7, 759 A.2d 217 (stating that "when the Legislature deems it essential that a private party have a right of action, it has expressly created one" (quotation marks omitted)).

[¶7]  To determine whether the STPA provides for a private right of action, we interpret the statute de novo to effectuate the legislative intent. *Foster v. State Tax Assessor*, 1998 ME 205, ¶ 7, 716 A.2d 1012.  The first and best indicator of legislative intent is the plain language of the statute itself.  *Id.*  If the statute is unambiguous, we interpret the statute according to its unambiguous

language, "unless the result is illogical or absurd." *MaineToday Media, Inc. v. State*, 2013 ME 100, ¶ 6, 82 A.3d 104 (quotation marks omitted). If the language is ambiguous, we will "consider the statute's meaning in light of its legislative history and other indicia of legislative intent." *Id.* "[I]f a statute can reasonably be interpreted in more than one way and comport with the actual language of the statute, an ambiguity exists." *Me. Ass'n of Health Plans v. Superintendent of Ins.*, 2007 ME 69, ¶ 35, 923 A.2d 918.

A.    Plain Language

[¶8] The STPA was enacted by a citizens' initiative in 1991. I.B. 1991, ch. 1, § 1 (effective Dec. 20, 1991); L.D. 719 (referred to the voters, 115th Legis. 1991); *see* Me. Const. art. IV, pt. 3, § 18. It provides,

**§ 73. Transportation policy**

**1. Short title.** This section may be known and cited as the "Sensible Transportation Policy Act."

**2. Purposes and findings.** The people of the State find that decisions regarding the State's transportation network are vital to the well-being of Maine citizens, to the economic health of the State and to the quality of life that the citizens treasure and seek to protect.

The people also find that these decisions have profound, long-lasting and sometimes detrimental impacts on the natural resources of the State, including its air quality, land and water.

The people further find that substantial portions of the state highway system are in disrepair and improvements to the State's roads and bridges are necessary to provide a safe, efficient, and adequate transportation network throughout the State.

The people further find that the State's transportation network is heavily dependent on foreign oil, that such reliance is detrimental to the health of the State's economy and that the health and long-term stability of the State's economy require increased reliance on more efficient forms of transportation.

The people further find that improvements to the transportation network are necessary to meet the diverse transportation needs of the people of the State including rural and urban populations and the unique mobility requirements of the elderly and disabled.

The people further find that the decisions of state agencies regarding transportation needs and facilities are often made in isolation, without sufficient comprehensive planning and opportunity for meaningful public input and guidance.

**3. Transportation policy.** It is the policy of the State that transportation planning decisions, capital investment decisions and project decisions must:

**A.** Minimize the harmful effects of transportation on public health and on air and water quality, land use and other natural resources;

**B.** Require that the full range of reasonable transportation alternatives be evaluated for all significant highway construction or reconstruction projects and give preference to transportation system management options, demand management strategies, improvements to the existing system, and other transportation modes before increasing highway capacity through road building activities;

**C.** Ensure the repair and necessary improvement of roads and bridges throughout the State to provide a safe, efficient and adequate transportation network;

**D.** Reduce the State's reliance on foreign oil and promote reliance on energy-efficient forms of transportation;

**E.** Meet the diverse transportation needs of the people of the State, including rural and urban populations and the unique mobility needs of the elderly and disabled;

**F.** Be consistent with the purposes, goals and policies of the Comprehensive Planning and Land Use Regulation Act; and

**G.** Incorporate a public participation process in which local governmental bodies and the public have timely notice and opportunity to identify and comment on concerns related to transportation planning decisions, capital investment decisions and project decisions. The department and the Maine Turnpike Authority shall take the comments and concerns of local citizens into account and must be responsive to them.

**4. Rulemaking.** The Department of Transportation shall adopt a rule within one year of the effective date of this Act, in coordination with the Maine Turnpike Authority and state agencies including the Department of Economic and Community Development, the Department of Agriculture, Conservation and Forestry and the Department of Environmental Protection, to implement the statewide comprehensive transportation policy. The rule must incorporate a public participation process that provides municipalities and other political subdivisions of the State and members of the public notice and opportunity to comment on transportation planning decisions, capital investment decisions, project decisions and compliance with the statewide transportation policy.

The Department of Transportation shall adopt a rule, in coordination with the Department of Agriculture, Conservation and Forestry, that establishes linkage between the planning processes outlined in this section and those promoted by Title 30-A, chapter 187, subchapter 2 and that promotes investment incentives for communities that adopt and implement land use plans that minimize over-reliance on the state highway network. This rule is a major substantive rule as defined in Title 5, chapter 375, subchapter 2-A.

**5. Applicability to Department of Transportation.** Transportation planning decisions, capital investment decisions and project decisions of the Department of Transportation are governed by and must comply with the transportation policy set forth in this section and rules implementing that policy.

**6. [Repealed.]**

**7. Priorities, service levels, capital goals and reporting.** The Department of Transportation shall classify the State's public highways as Priority 1 to Priority 6 corridors using factors such as the federal functional classification system, regional economic significance, heavy haul truck use and relative regional traffic volumes. The department shall also establish customer service levels related to safety, condition and serviceability appropriate to the priority of the highway, resulting in a system that grades each highway as Excellent, Good, Fair, Poor or Unacceptable.

To provide a capital transportation program that is geographically balanced and that addresses urban and rural needs, the department shall include the following goals as part of its capital improvement plans and program delivery. The goals are to:

   **A.** By 2022, improve all Priority 1 and Priority 2 corridors so that their safety, condition and serviceability customer service level equals Fair or better;

**B.** By 2027, improve all Priority 3 corridors so that their safety, condition and serviceability customer service level equals Fair or better;

**C.** By 2017, implement a pavement program for all Priority 4 corridors that maintains their ride quality customer service level at Fair or better;

**D.** Continue the light capital paving program on a 7-year cycle for Priority 5 corridors outside compact areas as defined in section 754; and

**E.** By 2015, develop and implement a similar asset priority and customer service level system of measurement for all major freight and passenger transportation assets owned or supported by the department, including capital goals.

The department shall report to the joint standing committee of the Legislature having jurisdiction over transportation matters by March 1st of each odd-numbered year quantifying progress realized and time that has elapsed since the goals were established. The department shall recommend any remedial actions, including additional funding or revisions to the goals, that the department determines to be necessary or appropriate.

23 M.R.S. § 73 (footnotes omitted). In short, the STPA has six primary components: it lists a series of "[p]urposes and findings" regarding transportation decisions; sets out seven policies to be integrated into transportation decisions; and requires the Department to adopt rules to implement the transportation policy, comply with the transportation policy and the rules implementing that policy, establish a priority system for state

highway improvements, and report to the Legislature on a biennial basis regarding its progress and plans in meeting those goals.  23 M.R.S. § 73.

[¶9]  As the LLCs concede, the plain language of the STPA unambiguously provides for no express private right of action.[5]  The LLCs argue, however, that a private right of action is instead implied by the STPA.  We discern nothing in the language of the STPA that implies the creation of a private right of action.  Contrary to the LLCs' suggestion, the mere presence of the words "must" and "shall" in a statute does not mean that a private right of action exists to enforce it.  In *Larrabee*, for example, one of the statutes at issue provided that "[a]n employer shall" complete certain acts or else be "subject to a forfeiture of not less than $50 nor more than $500."  486 A.2d at 101 & n.6 (quotation marks omitted).  Even given that language, we held that "nothing in the plain language or legislative history of [the provision] indicates that our Legislature intended a private party to have a right of action under [the statute]."[6]  *Id.* at 101.

---

[5]  In other matters in which we have recognized an express statutory right of action, the language of the relevant statutes has provided, for example, "Any person who . . . suffers any loss . . . as a result of [the conduct at issue] may bring an action . . . for restitution and for such other equitable relief, including an injunction, as the court may deem to be necessary and proper."  *Bartner v. Carter*, 405 A.2d 194, 199 (Me. 1979) (quotation marks omitted) (referring to the Unfair Trade Practices Act); *see Bank of Am., N.A. v. Camire*, 2017 ME 20, ¶ 13, 155 A.3d 416 (stating that the Maine Fair Debt Collection Practices Act affords consumers a private right of action by providing that "any debt collector who fails to comply with any provisions of this Act with respect to any person is liable to that person," 32 M.R.S. § 11054(1) (2017)).  The STPA does not contain similar language.

[6]  The LLCs' reliance on *Roop v. City of Belfast*, 2007 ME 32, 915 A.2d 966, is misplaced.  In that case, we held that city residents had common law standing to challenge the referendum process by

[¶10]   The LLCs further argue that the STPA would be a nullity—"a meaningless exercise"—in the absence of any enforcement mechanism.  They offer no authority for the proposition that a statute is a nullity unless it provides for a private right of action, however, and indeed, the STPA is similar in effect to numerous other statutory provisions that set out broad policy objectives, *e.g.*, 1 M.R.S. § 401 (2017); 9-A M.R.S. § 1-102(2) (2017); 18-A M.R.S. § 1-102(b) (2017); 22 M.R.S. § 4050 (2017), or require an entity to promulgate rules and regulations to further effectuate statutory objectives, *e.g.*, 4 M.R.S. § 198 (2017); 10 M.R.S. § 2369 (2017); 22 M.R.S. § 2124 (2017); 32 M.R.S. § 13722 (2017). That the STPA contains few or no particularities on how its broad transportation goals and policies are to be executed also indicates that it was not intended to afford any private right of action.  *See Barbuto v. Advantage Sales & Mktg., LLC*, 78 N.E.3d 37, 50 (Mass. 2017) (declining to imply a private right of action where the statute "provides no guidance as to what the appropriate contours of the implied right of action would be").

---

which an ordinance amendment was accomplished. *Id.* ¶¶ 2-11. We expressly declined to consider, however, whether the growth management statute—according to which the referendum process was completed—provided a private right of action because the parties never raised it. *Id.* ¶ 9 n.2; *see Lindemann v. Comm'n on Governmental Ethics & Election Practices*, 2008 ME 187, ¶ 8, 961 A.2d 538 ("[T]he question of whether a specific individual has standing is significantly affected by the unique context of the claim.").  To the extent *Roop* may have caused confusion, we take this opportunity to reiterate that, when there is no explicit language creating a private right of action, the courts should first determine whether a private right of action is available to enforce a statutory provision.

12

[¶11]  The STPA must be interpreted consistently with other provisions that unequivocally provide the Department with broad authority to manage the State's highways as a delegation of Executive Branch power.  *See* 23 M.R.S. § 52 (2017) (describing the Department's powers regarding "the planning, design, engineering, construction, improvement, maintenance and use of transportation infrastructure").  Nothing in the STPA suggests an encroachment on that authority.

[¶12]  We therefore conclude that the plain language of the STPA unambiguously provides for no implied private right of action.  Because the plain language of the STPA resolves the question before us, we need not look beyond that language to discern the legislative intent.  *See Stockly v. Doil*, 2005 ME 47, ¶ 12, 870 A.2d 1208.  Nevertheless, because the trial court and the parties focused on the legislative history of the statute, and in the interest of clarifying the means of determining legislative intent for citizen-enacted legislation, we address the legislative history of the STPA as well.  *See id.*

B.    Legislative History

[¶13]  As an initial matter, we address the LLCs' challenges to the procedure undertaken by the trial court when it evaluated the legislative history of the STPA to determine whether it discloses a legislative intent to

provide for a private right of action. Contrary to the suggestion underlying many of the LLCs' arguments, the legislative intent of any statutory enactment is determined wholly as a matter of law, not fact; the trial court determines legislative intent as a matter of law, and we determine legislative intent de novo as a matter of law on appeal. *MaineToday Media, Inc.*, 2013 ME 100, ¶ 7, 82 A.3d 104; *see In re Wage Payment Litig.*, 2000 ME 162, ¶ 4, 759 A.2d 217 ("If the plain meaning of the text does not resolve an interpretative issue raised, we then consider the statute's history, underlying policy, and other extrinsic factors to ascertain legislative intent."); *State v. Coombs*, 1998 ME 1, ¶ 9, 704 A.2d 387 (characterizing de novo review as "independent review for conclusions of law"); *League of Women Voters v. Sec'y of State*, 683 A.2d 769, 773-74 (Me. 1996) (determining legislative intent without any evidentiary presentations); *see also Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 189 (Alaska 2007) ("We also apply our independent judgment to questions of statutory interpretation and adopt the rule of law that is most persuasive in light of precedent, reason and policy." (alteration omitted) (quotation marks omitted)). Thus, no burden or standard of proof applies, judicial notice is not implicated,[7] "evidence" of legislative history is not offered or admitted, and the

---

[7] Pursuant to M.R. Evid. 201, judicial notice applies to "an adjudicative fact only, not a legislative fact." Whereas an adjudicative fact is the "'who-did-what-and-when' kind of question that normally

14

court is not limited to reviewing those portions of legislative history that have been provided by the parties. No matter what materials are directed to a court's attention, the court's review of any and all legislative history information in the course of its own evaluation of the law is not any more limited than a court's review of precedent identified by the parties.

[¶14]   Contrary to the LLCs' contention, legislative intent is therefore properly analyzed in the context of a Rule 12(c) motion without any evidentiary process.  Further, although consideration pursuant to Rule 12(c) required the trial court—and, on appeal, requires us—to make all *factual* inferences in favor of the LLCs, they are entitled to no favorable inferences as to the *legal* interpretation of the STPA—including the legislative intent as determined through its legislative history.  *See Cunningham*, 538 A.2d at 267.

[¶15]   In evaluating legislative intent using information beyond the language of the provision, we have relied on a variety of materials, including the statutory scheme in which the relevant section is found, *see Charlton v.*

goes to a jury," legislative facts "are those a court takes into account in determining the constitutionality or interpretation of a statute."   M.R. Evid. 201 Advisers' Note to 1976 promul. (quotation marks omitted).   We have also characterized legislative facts as those on which the Legislature relies as a matter of public policy in fashioning a statute. *See Aseptic Packaging Council v. State*, 637 A.2d 457, 460 (Me. 1994); *Durepo v. Fishman*, 533 A.2d 264, 265 (Me. 1987).   As the United States Supreme Court has held, "a legislative choice is not subject to courtroom fact-finding." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *see State v. $223,405.86*, 203 So. 3d 816, 831 (Ala. 2016) (stating that "the testimony of a trial witness as to what legislators intended in voting for a statute . . . is inadmissible as evidence").

*Town of Oxford*, 2001 ME 104, ¶ 16, 774 A.2d 366; the history of relevant codifications, amendments, and repeals, *see State v. Legassie*, 2017 ME 202, ¶¶ 16-20, 171 A.3d 589; the legislative committee file, including testimony before a committee and newspaper articles submitted to a committee, *see Craig v. Caron*, 2014 ME 115, ¶ 14, 102 A.3d 1175; *Bank of Am., N.A. v. Cloutier*, 2013 ME 17, ¶ 19, 61 A.3d 1242; *Me. Ass'n of Health Plans*, 2007 ME 69, ¶¶ 50-51, 923 A.2d 918; scholarly literature available at the time of the enactment, *see Cloutier*, 2013 ME 17, ¶ 20, 61 A.3d 1242; "preenactment history, including circumstances and events leading up to a bill's introduction," *see Estate of Robbins v. Chebeague & Cumberland Land Tr.*, 2017 ME 17, ¶ 24, 154 A.3d 1185 (quotation marks omitted); reports and recommendations from legislative task forces, committees, and working groups, *see Me. Ass'n of Health Plans*, 2007 ME 69, ¶ 54, 923 A.2d 918; *Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 10, 719 A.2d 111; narrative summaries and statements of fact accompanying proposed legislation and committee amendments, *see Me. Ass'n of Health Plans*, 2007 ME 69, ¶¶ 49, 52, 923 A.2d 918; "pronouncements of the legislators during their initial consideration" of a statute, *see id.* ¶ 47; legislative debate, *see id.* ¶ 55; contemporaneous legislation, *see In re Wage Payment Litig.*, 2000 ME 162, ¶¶ 9, 12, 759 A.2d 217; *Mundy v. Simmons*, 424 A.2d 135, 138

(Me. 1980); interpretations of federal counterpart statutes, *Batchelder v. Realty Resources Hospitality, LLC*, 2007 ME 17, ¶ 20, 914 A.2d 1116; information from uniform codes from which the provision may have originated, *see Guardianship of Sanders*, 2016 ME 99, ¶ 9 n.7, 143 A.3d 795; and the analysis of legislation by the Office of Policy and Legal Analysis, *see McLaughlin v. Superintending Sch. Comm.*, 2003 ME 114, ¶ 18, 832 A.2d 782.

[¶16]  "Citizen initiatives are reviewed according to the same rules of construction as statutes enacted by vote of the Legislature."  *Opinion of the Justices*, 2017 ME 100, ¶ 59, 162 A.3d 188; *see League of Women Voters*, 683 A.2d at 771.  Interpreting citizen-enacted legislation requires us to "ascertain the will of the people" rather than the will of the Legislature. *Opinion of the Justices*, 2017 ME 100, ¶ 7, 162 A.3d 188 (quotation marks omitted).

[¶17]  Legislative debate and other standard fare for determining legislative intent may be unavailable for citizen-enacted statutes, but we have the benefit of additional materials not available for Legislature-enacted statutes.  For example, the Attorney General is required by statute to issue a "brief explanatory statement that must fairly describe the intent and content and what a 'yes' vote favors and a 'no' vote opposes for each direct initiative."

1 M.R.S. § 353 (2017). The Office of Fiscal and Program Review also must "prepare an estimate of the fiscal impact on state revenues, appropriations and allocations of each measure that may appear on the ballot." 1 M.R.S. § 353. The language of the ballot question for a citizens' initiative is also an indication of legislative intent. *State v. Brown*, 571 A.2d 816, 818 (Me. 1990).

[¶18] We have relied on all such materials in determining legislative intent in prior matters. *Id.* ("In the absence of a challenge to the Attorney General's official explanation of the amendment, we assume that the voters intended to adopt the constitutional amendment on the terms in which it was presented to them . . . ."); *League of Women Voters*, 683 A.2d at 773-74 (discussing the Attorney General's explanatory statement attached to a referendum question); *see also Kritz*, 170 P.3d at 193 ("[W]hen we review a ballot initiative, we look to any published arguments made in support or opposition to determine what meaning voters may have attached to the initiative."); *People v. Clendenin*, 232 P.3d 210, 215 (Colo. App. 2009) (noting that "the explanatory publication of the Legislative Council of the Colorado General Assembly, otherwise known as the Blue Book . . . provides important insight into the electorate's understanding of [a citizen initiative] when it was passed and also shows the public's intentions in adopting the [enactment]."

18

(quotation marks omitted)); *Barbuto,* 78 N.E.3d at 49 ("[W]e look to the closest equivalent to legislative history, which is the Information for Voters guide that is prepared by the Secretary of the Commonwealth and sent to each registered voter before the election.").

[¶19] We turn to a review of all such materials relating to the enactment of the STPA. In 1991, "An Act to Deauthorize the Widening of the Maine Turnpike and to Create a Sensible Transportation Policy" was first presented to the Legislature. L.D. 719 (115th Legis. 1991). The bill proposed the enactment of the STPA as well as the amendment of several other existing statutes within title 23. L.D. 719 (referred to the voters, 115th Legis. 1991). The Legislature declined to enact it, 1 Legis. Rec. H-751 (1st Reg. Sess. 1991); 3 Legis. Rec. S-801 (1st Reg. Sess. 1991), and the statute was eventually enacted by citizen initiative on November 5, 1991.[8] I.B. 1991, ch. 1, § 1 (effective Dec. 20, 1991);

---

[8] The "Rule for the Sensible Transportation Policy Act," promulgated by the Department as required by the STPA, *see* 23 M.R.S. § 73(4) (2017), reiterates the policy goals in the STPA; sets out the "Statewide Long-Range Transportation Plan"; and addresses capital investment and project development strategies for the Department, the Maine Turnpike Authority, and municipalities. 8A C.M.R. 17 229 103-1 to -18, §§ I-III (2008). Like the STPA, to the extent the rule mandates any particular action by the Department, it does so only in the broadest of terms; it also places public participation procedures within the Department's discretion based on the scope and nature of the project at issue. *E.g.*, 8A C.M.R. 17 229 103-7 § I(7)(C) (requiring that the Department "initiate a public participation process commensurate with the scope of [a given] project" and listing examples of what the "information provided through the public participation process may include"); 8A C.M.R. 17 229 103-7 § I(7)(E) (stating that the Department "may hold a public hearing on the draft strategy evaluation and analyses"); 8A C.M.R. 17 229 103-9 § I(10)(A) (stating that the Department will "engage a public participation process" in the "preliminary design of funded projects, at [the

L.D. 719 (referred to the voters, 115th Legis. 1991); *see* Me. Const. art. IV, pt. 3, § 18; 21-A M.R.S. §§ 901-906 (2017).

[¶20]  The legislative history of the STPA persuades us that the particular focus of the bill was to prevent the Turnpike Authority from executing its plan to widen the Turnpike in southern Maine and to diminish the Turnpike Authority's ability to accomplish similar plans in the future.  The Statement of Fact accompanying the legislation stated as much in declaring that the legislation would "ensure that transportation decisions and the substantial commitments of public funds resulting from them are made in the context of a comprehensive, statewide transportation policy"; deauthorize the widening of the Maine Turnpike between Exits 1 and 6-A; require the Turnpike Authority to obtain the Legislature's approval for any widening or expansion of the Turnpike;[9] require the Turnpike Authority to transfer surplus funds to the Department; and make the Turnpike Authority's budget and expenditures subject to Legislative approval.  L.D. 719, Statement of Fact (referred to the voters, 115th Legis. 1991); *see* Office of Policy and Legal Analysis, Joint Standing

---

Department's] discretion or if requested by municipal officials").  The rule contains no mention of any enforcement, right of action, court proceedings, or litigation of any kind.

[9] The Turnpike Authority had previously been required to obtain Legislative approval only when widening the Turnpike to include more than three lanes in each direction between Exit 1 and Exit 6A, or more than two lanes in each direction elsewhere on the Turnpike.  23 M.R.S.A. § 1965(1)(D), 1968(1) (Supp. 1989); *see* L.D. 719, §§ 5, 7 (referred to the voters, 115th Legis. 1991).

Committee Bill Summaries, L.D. 719 (Aug. 1991). It is notable in this regard that every portion of the bill except the one enacting the STPA worked amendments to title 23, chapter 24, the chapter dedicated to the Maine Turnpike. L.D. 719 (referred to the voters, 115th Legis. 1991).

[¶21] More than forty people testified at a public hearing about the bill before the Transportation Committee; the overwhelming focus of that testimony was the Turnpike Authority's plan to widen the Turnpike in southern Maine. *An Act to Deauthorize the Widening of the Maine Turnpike and to Create a Sensible Transportation Policy: Hearing on L.D. 719 Before the Comm. on Transp.* (*Hearing on L.D. 719*), 115th Legis. (1991). The supporters of the bill cited a host of financial, safety, air pollution, public health, and environmental concerns raised by the widening. *Hearing on L.D. 719* (testimony of Booth Hemingway, Kittery Coordinator; Marshall Burke, Dir. of the Am. Lung Ass'n of Me.; Brownie Carson, Exec. Dir. of the Nat. Res. Council of Me.; Elizabeth Lovejoy for the Me. Audubon Soc'y). Opponents argued that failing to widen the Turnpike would compromise Maine's economic prospects for tourism and other industries, deny residents job opportunities, and create road safety issues. *Hearing on L.D. 719* (testimony of Jerry G. Haynes for the Associated Gen. Contractors of Me., Inc.; Jon Olson, Exec. Sec'y of the Me. Farm Bureau;

David M. Spahn, Chairman of the Gov't Affairs Comm. of the Sanford-Springvale Chamber of Commerce; Milton F. Huntington for the Me. Hwy. Users Conference; Clyde G. Berry, Master of the Me. State Grange). Notably, a handful of opponents pointed out that proponents of the bill seemed to be unaware that the legislation would have any lasting effect other than to prevent the widening of the Turnpike. *Hearing on L.D. 719* (testimony of Laurie R. Winsor, Pres. of the Lewiston-Auburn Chamber of Commerce; Maria Fuentes, Dir. of the Me. Better Transp. Ass'n; Chuck Roundy for the Econ. Dev. Council of Me.).

[¶22] The LLCs rely on the testimony of the former Commissioner of the Department, who set out numerous concerns about the bill—among them, "I also fear that this new policy would give anyone the ability to stop a road improvement project by intervening or filing endless lawsuits." *Hearing on L.D. 719* (testimony of Dana F. Connors, Comm'r of the Dep't of Transp.). The Commissioner's mention of the potential for litigation was a generalized statement that does little to suggest that the intent of the bill was to establish an implied private right of action; the testimony merely sets out the Commissioner's fear that others might interpret the bill in that manner.[10]

---

[10] If a statute is ambiguous, we "will uphold the agency's interpretation in its field of expertise unless the statute plainly compels a contrary result." *Me. Ass'n of Health Plans v. Superintendent of Ins.*, 2007 ME 69, ¶ 32, 923 A.2d 918 (quotation marks omitted). Whether the legislative intent of a statute was to create an implied private right of action is not within the Department's technical

Further, although several opponents worried that a new transportation policy might hinder road improvements, none addressed precisely how, by whom, or in what circumstances road work could be stymied. *Hearing on L.D. 719* (testimony of Fuentes; Paul Violette; Berry; Jack Dexter, Pres. of the Me. Chamber of Commerce and Indus.) Rather, the opponents warned against a general anti-growth policy that they feared the enactment of the bill could signal. *Hearing on L.D. 719* (testimony of Roundy, Winsor). Indeed, other than the Commissioner's single mention, the testimony contains no reference to a private right of action or, in fact, any mention of the STPA at all.

[¶23] When the bill was presented to the voters by referendum, the ballot question was similarly focused on the broad policies at issue as applied to the widening of the Maine Turnpike; it asked, "Do you favor the changes in Maine Law concerning deauthorizing the widening of the Maine turnpike and establishing transportation policy proposed by citizen petition?" G. William Diamond, Sec'y of State, *Maine Citizen's Guide to Upcoming Initiative, Bond Issues, and Proposed Constitutional Amendment* (*Citizen's Guide*) 3 (1991).

---

expertise, and therefore we do not defer to the Department's interpretation of the STPA on that subject. *See Kane v. Comm'r of Dep't of Health & Human Servs.*, 2008 ME 185, ¶ 12, 960 A.2d 1196 (stating that deference is afforded only as to matters *not* within this Court's expertise); *Nichols v. Cantara & Sons*, 659 A.2d 258, 260-61 (Me. 1995) (holding that the calculation of a claim for loss of consortium is "not within the authority or traditional expertise of [the Workers' Compensation] Board").

[¶24]  The *Citizen's Guide* to the 1991 referendum, published pursuant to 1 M.R.S. § 353, also gave no hint that any private right of action would be created.  Like the Statement of Fact, the *Citizen's Guide* stated that the bill would require the adoption of a new transportation policy, "repeal existing statutory authority to widen the Maine Turnpike," require legislative approval of the Turnpike Authority's budget, and require that surplus Turnpike Authority funds be transferred to the Department.  L.D. 719, Statement of Fact (referred to the voters, 115th Legis. 1991); *Citizen's Guide* 12.

[¶25]  Finally, although the STPA has undergone several amendments by the Legislature since 1991, in none of them has the Legislature made any adjustments indicating an intent to allow the enforcement of the STPA by implied private right of action.  *See* R.R. 1991, ch. 2, § 88; P.L. 2003, ch. 22, § 1 (effective Sept. 13, 2003); P.L. 2007, ch. 470, § B-1 (effective June 30, 2008); P.L. 2011, ch. 610, §§ B-1, B-2 (effective Aug. 30, 2012); P.L. 2011, ch. 655, §§ JJ-9, JJ-41 (effective July 1, 2012); P.L. 2011, ch. 657, § W-5 (effective Aug. 30, 2012).

[¶26]  These legislative history sources do not purport to set out the intent of all—or even most—of the citizens who voted to enact the STPA, but they do illuminate the context and substance of the statewide conversation that

culminated in the citizens' enactment of the STPA in 1991. *See Brown*, 571 A.2d at 818 (adopting "a common sense view of the context in which the voters of Maine adopted [a provision]"). The bulk of that conversation regarded the widening of the Maine Turnpike, indicating that the STPA was intended to reset the State's broad transportation policy goals. Citizen-initiated legislation must be interpreted liberally to effectuate its purpose, *Opinion of the Justices*, 2017 ME 100, ¶ 59, 162 A.3d 188, but it should not be interpreted beyond the scope of the legislative intent underlying its enactment, *League of Women Voters*, 683 A.2d at 773 ("It is fundamental that we look to the purpose for which a law is enacted, and that we avoid a construction which leads to a result clearly not within the contemplation of the lawmaking body." (quotation marks omitted)); *see Kritz*, 170 P.3d at 192 n.28 ("[T]o imply into statute what is not apparent on its face would be stepping over the line of interpretation and engaging in legislation." (quotation marks omitted)). None of these sources suggests that the legislative intent in enacting the STPA was to create an implied private right of action.

[¶27] We conclude that the STPA provides for no implied private right of action to allow enforcement of its terms and that the Superior Court committed

no error in entering a judgment on the pleadings as to Count 1 based on the nonjusticiability of the LLCs' claim.

The entry is:

Judgment affirmed.

_____

Robert S. Hark, Esq. (orally), Portland, and Peggy L. McGehee, Esq., and Lauren B. Weliver, Esq., Perkins Thompson, Portland, for appellants Wawenock, LLC, Bermuda Isles, LLC, 48 Federal Street LLC, and 32 Middle Street LLC

Nathaniel M. Rosenblatt, Esq. (orally), and Kate J. Grossman, Esq., Farrell, Rosenblatt & Russell, Bangor, and James A. Billings, Esq., Maine Department of Transportation, Augusta, for appellee Department of Transportation

Business and Consumer Docket docket number CV-2017-14
FOR CLERK REFERENCE ONLY