MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2021 ME 34
Docket:      Cum-21-31
Argued:      May 4, 2021
Decided:     July 6, 2021

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, JJ., and CLIFFORD, ARJ.

## PORTLAND REGIONAL CHAMBER OF COMMERCE et al.

### v.

## CITY OF PORTLAND et al.

MEAD, J.

[¶1]  Portland Regional Chamber of Commerce and other entities[1] (collectively, the Chamber) appeal from a judgment of the Superior Court (Cumberland County, *Warren, J.*) granting summary judgment against the Chamber on its claims that voter-initiated legislation establishing an emergency minimum wage in Portland violates the Maine Constitution and the Portland City Code.  Caleb Horton and Mario Roberge-Reyes (Intervenors) cross-appeal from the court's determination that the emergency minimum wage provision is not effective until January 1, 2022.  We affirm the judgment.

---

[1]  The plaintiffs are Portland Regional Chamber of Commerce; Alliance for Addiction and Mental Health Services, Maine; Slab, LLC; Nosh, LLC; Gritty McDuff's; and Play It Again Sports.

## I. BACKGROUND

[¶2]   The pertinent facts are not contested and are drawn from the summary judgment record.  *See Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 25, 133 A.3d 1021.  In July 2020, the required number of Portland voters submitted to the City of Portland a petition in support of a direct voters' initiative to amend Portland's minimum wage ordinance.  The initiative included a section incrementally increasing the regular minimum wage on an annual basis and a provision (the emergency provision) that provided for a higher minimum wage—one-and-one-half times the regular minimum wage—when the governor or the City of Portland declares a state of emergency.  On November 3, 2020, the City of Portland held its general municipal election, and the voters approved the initiative; the City of Portland released the amended official results on November 6, 2020.  *See* Portland, Me., Code § 33.7 (Nov. 3, 2020).  The pertinent portions of the newly passed legislation read:

(b)   *Minimum Wage rate:*

(i)    Beginning on January 1, 2022, the regular Minimum Wage for all Employees, including, but not limited to, Service Employees, shall be raised to $13.00 per hour;

(ii)   Beginning on January 1, 2023, the regular Minimum Wage for all Employees, including, but not limited to,

Service Employees, shall be raised to $14.00 per hour; and

(iii)  Beginning on January 1, 2024, the regular Minimum Wage for all Employees, including, but not limited to, Service Employees, shall be raised to $15.00 per hour; and

(iv)  On January 1, 2025 and each January 1st thereafter, the minimum hourly wage then in effect must be increased by the increase, if any, in the cost of living. The increase in the cost of living must be measured by the percentage increase, if any, as of August of the previous year over the level as of August of the year preceding that year in the Consumer Price Index for All Urban Consumers, CPI-U, for the Northeast Region, or its successor index, as published by the United States Department of Labor, Bureau of Labor Statistics or its successor agency, with the amount of the minimum wage increase rounded to the nearest multiple of 5¢. If the state minimum wage established by 26 M.R.S. § 664 is increased in excess of the minimum wage in effect under this ordinance is increased to the same amount, effective on the same date as the increase in the state minimum wage, and must be increased in accordance with this ordinance thereafter.

. . . .

(g)  *Effect of Emergency Proclamation.* For work performed during a declared emergency, the effective Minimum Wage rate established by this ordinance shall be calculated as 1.5 times the regular minimum wage rate under subsection (b) above. A declared emergency under this ordinance shall include the period of time during which:

(i)  A proclamation issued pursuant to Chapter 2, Sec. 2-406, of this code declares an emergency to exist,

4

> > (ii) A proclamation issued pursuant to 37-B M.R.S. § 742 declares an emergency to exist, if such emergency proclamation is geographically applicable to the Employee's workplace.
>
> A declared emergency under this ordinance shall not apply to work performed under a teleworking arrangement, as defined under 5 U.S.C. § 6501, allowing the Employee to work from home.

*Id.* § 33.7(b), (g).

[¶3] The City of Portland announced that it would not enforce the emergency provision until January 1, 2022. On December 1, 2020, the plaintiffs, all employers with employees in Portland, filed a complaint seeking declaratory relief against the City of Portland and Jon Jennings, in his official capacity as City Manager of Portland (collectively, the City). They asserted that the initiative was invalid under the Maine Constitution and the Portland City Code and that, if it was valid, it would not take effect until January 1, 2022. Horton and Roberge-Reyes, employees at the Whole Foods store in Portland, were granted intervenor status as defendants and cross-plaintiffs; they filed a cross-claim seeking declaratory relief establishing the effective date of the emergency provision as December 6, 2020, and injunctive relief compelling the City to enforce it.

[¶4]  The Chamber moved for summary judgment on its complaint.  The Superior Court concluded that the emergency provision was validly enacted pursuant to the Maine Constitution and the Portland City Code.  It determined that the home rule provision in the Constitution, in conjunction with statute, granted municipalities greater legislative authority and therefore expanded the scope of direct initiatives.  Accordingly, it granted summary judgment against the Chamber on its validity claims.  The court then determined that the language of the emergency provision was unambiguous and established an effective date of January 1, 2022.  It dismissed Intervenors' cross-claims.

[¶5]  The Chamber timely appealed from the judgment declaring that the emergency provision was valid, and Intervenors timely cross-appealed from the determination that the emergency provision becomes effective on January 1, 2022. *See* 14 M.R.S. § 1851 (2021); M.R. App. P. 2B(c)(1). We granted expedited consideration of this appeal.

## II.  DISCUSSION

A.    Validity

[¶6]  The Chamber argues that the emergency provision was not validly enacted under the Maine Constitution and the Portland City Code because the initiative is not limited to exclusively municipal affairs.  It asserts that the home

rule provision of the Constitution is irrelevant because it gives greater power to municipalities as political subdivisions of the State but does not expand the scope of direct voters' initiatives. The City defends the validity of the initiative.

1. The Maine Constitution

[¶7] On appeal from a summary judgment decision, "we review de novo the trial court's interpretation and application of the relevant statutes and legal concepts." *Belanger v. Yorke*, 2020 ME 24, ¶ 13, 226 A.3d 215 (quotation marks omitted). We review constitutional interpretation issues de novo. *Bouchard v. Dep't of Pub. Safety*, 2015 ME 50, ¶ 8, 115 A.3d 92. "Constitutional provisions are accorded a liberal interpretation in order to carry out their broad purpose, because they are expected to last over time and are cumbersome to amend." *Allen v. Quinn*, 459 A.2d 1098, 1102 (Me. 1983). "[T]he constitutional validity of a citizen initiative is evaluated under the ordinary rules of statutory construction." *League of Women Voters v. Sec'y of State*, 683 A.2d 769, 771 (Me. 1996). Accordingly, such laws "carr[y] a heavy presumption of constitutionality." *Id.*

[¶8] Last year we reiterated the purpose and breadth of the direct initiative power:

> The broad purpose of the direct initiative is the encouragement of participatory democracy. By [Me. Const. art. IV, pt. 3, § 18] the

> people, as sovereign, have retaken unto themselves legislative power, and that constitutional provision must be liberally construed to facilitate, rather than to handicap, the people's exercise of their sovereign power to legislate. Section 18 cannot be said merely to *permit* the direct initiative of legislation upon certain conditions. Rather, it reserves to the people the *right* to legislate by direct initiative if the constitutional conditions are satisfied.

*Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 15, 237 A.3d 882 (alterations and quotation marks omitted); *see League of Women Voters*, 683 A.2d at 771; *see also Opinion of the Justices*, 275 A.2d 800, 803 (Me. 1971).

[¶9] We begin with some historical context for this case. Effective in 1909, the Maine Constitution was amended to shift some legislative power from the Legislature to the people. *See Farris v. Goss*, 143 Me. 227, 230, 60 A.2d 908 (1948); Const. Res. 1907, ch. 121, *approved in* 1908. Pursuant to the amendment, a sufficient number of citizens may directly propose a law by petition to the Legislature, and if it is not enacted, the Legislature must submit the law to the people. Me. Const. art. IV, pt. 3, § 18. The Maine Constitution further provides that this power of direct initiative may be extended to the voters of municipalities:

> The city council of any city may establish the direct initiative and people's veto for the electors of such city in regard to its municipal affairs, provided that the ordinance establishing and providing the method of exercising such direct initiative and people's veto shall not take effect until ratified by vote of a majority of the electors of said city, voting thereon at a municipal election. Provided,

however, that the Legislature may at any time provide a uniform method for the exercise of the initiative and referendum in municipal affairs.

Me. Const. art. IV, pt. 3, § 21.

[¶10] Pursuant to this authority, the Portland City Council enacted a direct initiative ordinance in 1950. *See* Portland, Me., Code § 9-36 (May 7, 1991); *see also LaFleur v. Frost*, 146 Me. 270, 272, 80 A.2d 407 (1951) (discussing the passage of the ordinance in 1950). In relevant part, the ordinance provides that voters may petition the city council to submit to a vote "any proposed ordinance dealing with legislative matters on municipal affairs." Portland, Me., Code § 9-36(a).

[¶11] In 1969, the Maine Constitution was amended to add the home rule provision: "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act." Me. Const. art. VIII, pt. 2, § 1; *see* Const. Res. 1969, ch. 29, *passed in* 1969. This authority is manifested in statute: "Any municipality, by the adoption, amendment or repeal of ordinances or bylaws, may exercise any power or function which the Legislature has power to confer upon it, which is not denied either expressly or

by clear implication, and exercise any power or function granted to the municipality by the Constitution of Maine, general law or charter." 30-A M.R.S. § 3001 (2021).[2]

[¶12]  Turning now to this case, we examine two cases that were discussed at length in arguments and in the Superior Court's order: *Burkett v. Youngs*, 135 Me. 459, 199 A. 619 (1938), and *Albert v. Town of Fairfield*, 597 A.2d 1353 (Me. 1991).  In *Burkett*, we concluded that a resolve passed by the Bangor City Council addressing appropriations for school funding was not subject to referendum because some of the appropriations were required by state law, and thus the resolve was not a local affair.  135 Me. at 461-67, 199 A. 619.  In *Albert*, we concluded that a municipal referendum was valid where Fairfield voters rejected the Town Council's decision to accept a street as a town way.  597 A.2d at 1354-55.

[¶13]  Both cases are distinguishable from the facts and circumstances presented in the matter pending before us.  *Burkett* was decided before the home rule provision was added to Maine's constitution in 1969, and furthermore, in that case, a direct and patent conflict existed between a state

---

[2] Title 30-A M.R.S. § 3001 (2021), the current municipal home rule statute, was originally codified at 30 M.R.S.A. § 1917 (Supp. 1970); the original statute was repealed and replaced in 1987.  *See* P.L. 1969, ch. 563 (effective May 9, 1970); P.L. 1987, ch. 737, §§ 2, 106 (effective Mar. 1, 1989) (codified as subsequently amended at 30-A M.R.S. § 3001).

funding mandate and the voters' initiative, thus taking the initiative outside the purview of the municipal direct initiative authority. *See* 135 Me. at 463-66, 199 A. 619; Const. Res. 1969, ch. 29, *passed in* 1969. *Albert* is distinguishable because, in that case, the Legislature had, by statute, expressly granted the discretionary power to accept a town way to a municipality. 597 A.2d at 1355. Although both cases are helpful, neither established bright-line, authoritative criteria as a matter of precedent, and neither controls this case. *See Albert*, 597 A.2d at 1354-55; *Burkett*, 135 Me. at 463-67, 199 A. 619.

[¶14] We disagree with the Chamber's assertion that the home rule provision is irrelevant to this case. Both the home rule and direct initiative provisions are part of the structure that grants authority to municipalities and voters to legislate with respect to municipal affairs. *See* Me. Const. art. IV, pt. 3, § 21; *id.* art. VIII, pt. 2, § 1. The City first gave legislative authority to the voters by enacting its direct initiative ordinance. Portland, Me., Code § 9-36. After the City enacted that ordinance, the State imbued municipalities with more powers by virtue of the home rule provisions. *See* Me. Const. art. VIII, pt. 2, § 1; 30-A M.R.S. § 3001. The broad sweep of the home rule provision granting the power of "[t]he inhabitants of any municipality . . . to alter and amend their charters on all matters, not prohibited by Constitution or general law" sweeps

in the preexisting right of voters' direct initiatives. *See* Me. Const. art. VIII, pt. 2, § 1. Accordingly, the rights of municipalities to legislate pursuant to the home rule provisions are coextensive with the rights of the voters under direct initiatives.

[¶15] The Chamber correctly points out that the home rule provision provides authority to municipalities as political subdivisions of the State. *See* Me. Const. art. VIII, pt. 2, § 1; 30-A M.R.S. § 3001. And, indeed, as the Chamber argues, individual electors are not political subdivisions. As we have explained, however, it is the relationship between the home rule and direct initiative provisions that gives electors the authority to legislate in this instance. The home rule provision of the Maine Constitution grants legislative authority to municipalities with respect to municipal affairs. *See* Me. Const. art. VIII, pt. 2, § 1. Prior to the enactment of the home rule provision, municipalities had the preexisting constitutional authority to empower their voters to legislate by direct initiative. *See* Me. Const. art. IV, pt. 3, § 21. Our decision today does not purport to characterize individuals as political subdivisions. But they need not be in order to exercise their legislative authority as established in the Maine Constitution.

[¶16]  The home rule provision expressly limits what municipalities may legislate concerning to matters "not prohibited by Constitution or general law." Me. Const. art. VIII, pt. 2, § 1.  In instances where the Legislature has specifically provided that particular subject matters are the sole province of the State, they are then clearly outside the scope of the home rule provision because they are "prohibited by Constitution or general law."  *Id.*  There may also be instances, however, where the Legislature has impliedly occupied the field in specific subject areas.  *See* 30-A M.R.S. § 3001. Given their fact-specific nature, such instances must be evaluated on a case-by-case basis by examining the language of the ordinance and any statutes enacted by the Legislature.

[¶17]  The constitutional grant to electors of the power to legislate by direct initiative and by people's veto uses the language "in regard to its municipal affairs" to limit the scope of the subject matter of a direct initiative, Me. Const. art. IV, pt. 3, § 21, but this language does not prohibit voters from enacting a direct initiative to increase minimum wages beyond that set by statute.  The local minimum wage is among the issues encompassed by municipal legislative authority because that authority has not been denied expressly or implicitly by the Constitution or general law.  *See* Me. Const. art. VIII, pt. 2, § 1; 30-A M.R.S. § 3001; 26 M.R.S. § 664 (2021) (establishing

statewide minimum wage). Indeed, the Portland City Code presently reflects this understanding. *See* Portland, Me., Code § 33.1 (Jan. 1, 2016) ("[T]o promote the health, safety and welfare of its citizens and pursuant to and consistent with 26 M.R.S. §664, the City Council of the City of Portland, Maine hereby establishes the following minimum wage ordinance applicable to all Employers and Employees within the City of Portland.").

[¶18] The fact that an ordinance that is otherwise directed to matters within the geographical confines of the municipality may affect nonresident individuals or entities who have employment or business interests within the municipality does not mean that it loses its characterization as "local and municipal." The key inquiry is whether the ordinance provision is fundamentally local or statewide in its scope. *See* Me. Const. art. VIII, pt. 2, § 1; 30-A M.R.S. § 3001; *Sch. Comm. of Town of York v. Town of York*, 626 A.2d 935, 939 (Me. 1993). We conclude that the initiative at issue with its emergency multiplier provision, found in Portland City Code § 33.7(g), falls into the category of local or municipal affairs and was validly enacted pursuant to the Maine Constitution.

14

### 2. Portland City Code

[¶19]   We review "legal issues concerning the interpretation of the [Portland] City Code . . . de novo for errors of law." *Friends of Cong. Square Park v. City of Portland*, 2014 ME 63, ¶ 7, 91 A.3d 601.  Pursuant to the City Code, Portland voters may petition the city council to submit to a vote "any proposed ordinance dealing with legislative matters on municipal affairs."  Portland, Me., Code § 9-36(a).

[¶20]  As with the Chamber's constitutional argument, its argument that the emergency provision does not relate to "municipal affairs" as provided in the Portland City Code fails.  Although Portland's original direct initiative ordinance was adopted before the home rule provisions, *see LaFleur*, 146 Me. at 272, 80 A.2d 407; Const. Res. 1969, ch. 29, *passed in* 1969, the meaning and scope of "municipal affairs" in the ordinance has evolved alongside the related law, including the adoption of the home rule provision.  *See, e.g.,* Me. Const. art. VIII, pt. 2, § 1; 30-A M.R.S. § 3001; *Sch. Comm. of Town of York*, 626 A.2d at 938-39.  As we have explained with respect to the Maine Constitution, the

emergency provision here relates to municipal affairs.  Therefore, it likewise does not run afoul of Portland's direct initiative ordinance.[3]

[¶21]  Moreover, the ordinance that empowers Portland electors with direct initiative authority is a predominantly procedural provision; it explains *how* a petition for a direct initiative is to be filed.[4]  *See* Portland, Me.,

---

[3]  Chamber of Commerce asserted in the Superior Court that the emergency provision did not relate to "legislative matters" as set out in Portland's City Code, *see* Portland, Me., Code § 9-36(a) (May 7, 1991), but it has abandoned that argument on appeal.

[4]  The text of Portland City Code § 9-36 reads:

**Sec. 9-36.  How invoked.**

(a)  *In general.*  The submission to the vote of the people of any proposed ordinance dealing with legislative matters on municipal affairs or of any such ordinance enacted by the city council and which has not yet gone into effect, may be accomplished by the presentation of a petition therefor to the city council in the manner hereinafter provided and signed by at least one thousand five hundred (1,500) voters.  The submission of a proposed ordinance, or amendment or repeal, in whole or in part, of an ordinance already in effect shall be hereinafter referred to as the direct initiation of legislation or "initiative."  The submission of a petition to override any ordinance passed by the city council but which has not yet gone into effect shall be hereinafter referred to as the "people's veto."

(b)  *Applicability.*  Neither this article, nor ordinances dealing with appropriations, tax levy, or with wages or hours of city employees shall be subject to the initiative and "people's veto" referendum provisions herein established.

(c)  *Petition procedure.*  Any ten (10) registered voters of the city may file with the city clerk an affidavit stating:

(1)  That the ten (10) registered voters will constitute the petitioners' committee;

(2)  The names and addresses of the ten (10) registered voters;

(3)  The address to which all notices to the committee are to be sent; and

(4)  That the ten (10) registered voters will circulate the petition and file it in proper form.

16

Upon filing of said affidavit by ten (10) such voters, the city clerk shall have seven (7) calendar days to prepare the proper petition forms pursuant to section 9-37 below with a copy of the submitted ordinance either printed on the petition or attached thereto and shall provide such petition to members of the petitioners' committee and to any other registered city voter who wishes to circulate it. The petition may be circulated for signature by registered voters of the city for eighty (80) calendar days from the original date of issuance of the petition, which date shall be noted by the clerk on each blank form; provided, however, that any petition for the "people's veto" of an ordinance not in effect must be filed with the city clerk prior to the effective date of said ordinance or within thirty (30) calendar days after passage by the city council, whichever is less. Any "people's veto" petition not so filed is void. All provisions as to the filing and the form of petitions in this article, other than the aforementioned time frame, shall apply to both initiative and "people's veto" petitions.

(d)     *Filing of petition.*  The petition must be returned to the city clerk for filing by close of business within eighty (80) calendar days from the date of issuance thereof.  If the eightieth day is a Saturday, Sunday or holiday, said petition shall be filed by the close of business of the next immediate business day.  All petition forms not so submitted are void.  The petition forms shall be assembled as one (1) instrument, with each page numbered, attached to a written statement from the petitioners' committee stating the number of petition forms being filed.  The clerk shall certify the date of filing and the number of forms returned.

(e)     *Verification of petition.*

(1)     Within fifteen (15) calendar days after the petition is filed, the clerk shall complete a certificate as to its sufficiency, specifying, if it is insufficient, the particulars which render it defective.  The clerk shall promptly send a copy of the certificate to the petitioners' committee by certified mail, return receipt requested, or by hand-delivery, and shall file a copy with the city council.

(2)     A petition certified insufficient may be amended once, if the petitioners' committee files a written notice of intention to amend it with the clerk within eight (8) calendar days after mailing by certified mail, return receipt requested, or hand-delivery of the copy of the clerk's certificate.  Within ten (10) calendar days after this notice of intention is filed, the petitioners' committee may file a supplementary petition to correct technical deficiencies in the original which shall, in form and content, comply with the requirements for an original petition but which shall not contain additional signatures of voters.

(3)     Within five (5) calendar days after a supplementary petition is filed, the clerk shall complete and file a certificate as to its sufficiency in the manner provided for in an original petition.

Code § 9-36. Subsection a imbues voters with legislative authority, and subsections c through f address how a direct initiative may be achieved. *Id.* § 9-36(a), (c)-(f). The remaining subsection specifically excludes matters that are not subject to direct initiative. *Id.* § 9-36(b). Consequently, the direct initiative ordinance—except with respect to subsection b—merely facilitates the substantive law that exists and that may evolve separate and apart from the procedure. In sum, the topics on which municipalities have the prerogative to legislate have evolved, and the procedures established by Portland City Code § 9-36 are not limited to the topics existing at the time of its promulgation.

---

(4)   Any petition finally determined to be insufficient is void. The clerk shall stamp the petition void and seal and retain it in the manner required for secret ballots.

(5)   The clerk's decision as to the sufficiency of the petitions shall be a final determination, reviewable as provided by law.

(f)   *Hearing.* At its first regular meeting after receipt of a report that a petition is sufficient and has at least one thousand five hundred (1,500) valid signatures of the registered voters of the city, the city council shall set a date for public hearing, which hearing shall be held within thirty (30) calendar days thereafter. Notice of the hearing shall be published in a newspaper having general circulation in the city at least ten (10) calendar days prior to the hearing and shall contain the text of the petition. As provided by section 9-39, the city council shall take the necessary steps to submit to the voters of the city the ordinance proposed in the petition; provided that, in the case of the "people's veto" referendum, the entire repeal by the city council of the ordinance sought to be referred and, in the case of the initiative, the passage by the city council of the desired ordinance shall put an end to all proceedings under the petition.

18

B.      Effective Date

[¶22]  Having concluded that the emergency provision in the initiative is valid, we must also determine its effective date.  Intervenors argue that the effective date for new ordinances established by ordinance, *see* Portland, Me., Code § 9-42 (May 7, 1991), thirty days from the date of the official results, applies to the emergency provision, making the effective date fall in December 2020.  Alternatively, they assert that if the language is ambiguous, then it should be read to establish a December 2020 effective date to comport with the understanding and expectations of the parties and voters.  They also argue that we should consider the ballot question to construe the plain language of the emergency provision.  The Chamber and the City contend that the plain language of the emergency provision establishes an effective date of January 1, 2022.

[¶23]  "Interpretation of [an] [o]rdinance is a question of law that we review de novo."  *Fitanides v. City of Saco*, 2015 ME 32, ¶ 13, 113 A.3d 1088.  "We first determine if the language of the ordinance is plain and unambiguous." *Olson v. Town of Yarmouth* , 2018 ME 27, ¶ 16, 179 A.3d 920.  We interpret the ordinance accordingly, "unless the result is illogical or absurd."  *Wawenock, LLC v. Dep't of Transp.,* 2018 ME 83, ¶ 7, 187 A.3d 609 (quotation marks omitted).

Language is ambiguous when it "can reasonably be interpreted in more than one way." *Id.* (quotation marks omitted).

[¶24] We construe words in an ordinance according to their plain meaning and "construe undefined or ambiguous terms reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." *Fitanides*, 2015 ME 32, ¶ 13, 113 A.3d 1088 (quotation marks omitted). We seek "to give effect to legislative intent, and if the meaning of the [ordinance] is clear on its face, then we need not look beyond the words themselves." *Jade Realty Corp. v. Town of Eliot*, 2008 ME 80, ¶ 7, 946 A.2d 408 (quotation marks omitted).

[¶25] Here, the language of the emergency provision is unambiguous on its face and therefore we need not go beyond the text. *See Fitanides*, 2015 ME 32, ¶ 13, 113 A.3d 1088; *Jade Realty Corp.*, 2008 ME 80, ¶ 7, 946 A.2d 408. The emergency provision in Portland City Code § 33.7(g) provides the timing of the minimum wage increases by cross-reference to subsection b: "the effective Minimum Wage rate established by this ordinance shall be calculated as 1.5 times the regular minimum wage rate under subsection (b) above." Subsection b is further divided into four subsections, the first of which states, "Beginning on January 1, 2022, the regular Minimum Wage

for all Employees . . . shall be raised to $13.00 per hour." *Id.* § 33.7(b)(i). Each subsequent subsection begins with the following year and raises the regular minimum wage by $1.00 per hour, with an increase based on the cost of living after a $15.00 minimum wage is reached. *Id.* § 33.7(b)(ii)-(iv).

[¶26] The newly passed legislation does not explicitly state an effective date for the emergency provision. *See id.* § 33.7. Nevertheless, the ordinary meaning of the text establishes that the new minimum wage rate comes into effect on January 1, 2022, and increases incrementally thereafter. *See id.* § 33.7(b); *Fitanides*, 2015 ME 32, ¶ 13, 113 A.3d 1088. Because the emergency provision cross-references subsection b to establish the effective minimum wage rate for computing the emergency minimum wage, the first effective date is established there. *See* Portland, Me., Code § 33.7(g). In subsection b, subsection b(i) appears first, and the text provides that the subsection is effective as of January 1, 2022. *Id.* § 33.7(b)(i). Thus, the effective date of subsection g is also January 1, 2022. Because the emergency provision itself provides an effective date, Portland City Code § 9-42 does not apply.

[¶27] We reject Intervenors' argument that Portland City Code § 33.7(b)(iv) supports an effective date for the imposition of the new minimum wage provisions in December 2020. That subsection begins: "On

January 1, 2025 and each January 1st thereafter, the minimum hourly wage then in effect must be increased by the increase, if any, in the cost of living." *Id.* § 33.7(b)(iv). It then provides that if the state minimum wage is increased above the local minimum wage in effect under the ordinance, "the minimum wage under this ordinance is increased to the same amount, effective on the same date as the increase in the state minimum wage." *Id.* The most natural reading of this subsection—particularly considering the newly passed legislation's structure establishing annual, chronological increases, *see Fitanides*, 2015 ME 32, ¶ 13, 113 A.3d 1088—is that it does *not* provide for a local minimum wage beginning in December 2020, and there is no local minimum wage until subsection b(i) comes into effect because the newly passed legislation repealed the previous local minimum wage.

[¶28] Furthermore, the ordinary use of "thereafter" in the first sentence conveys that the preceding subsections must take effect first given that they appear chronologically. *See* Portland, Me., Code § 33.7(b)(iv). After that sentence, subsection b(iv) provides that the state minimum wage will take effect if it is higher. *See id.* This schedule most naturally means that subsection b(iv) is not yet in effect, and therefore, it cannot be the source of an effective date before the first effective date of January 1, 2022, in subsection b(i). *See*

*Fitanides*, 2015 ME 32, ¶ 13, 113 A.3d 1088.  This result is neither illogical nor absurd, *see Wawenock, LLC*, 2018 ME 83, ¶ 7, 187 A.3d 609, because there are valid reasons for delaying application of the emergency provision.[5] Notwithstanding Intervenors' insistence that we consider the ballot question in interpreting the ordinance, we do not examine any extrinsic evidence in the absence of textual ambiguity, and there is no such ambiguity here.  *See Jade Realty Corp.*, 2008 ME 80, ¶ 7, 946 A.2d 408.  Accordingly, the emergency provision is effective as of the date set in Portland City Code § 33.7(b)(i), which is January 1, 2022.

The entry is:

Judgment affirmed.

---

John J. Aromando, Esq. (orally), James R. Erwin, Esq., Joshua D. Dunlap, Esq., and Sara A. Murphy, Esq., Pierce Atwood LLP, Portland, for appellants Portland Regional Chamber of Commerce; Alliance for Addiction and Mental Health Services, Maine; Slab, LLC; Nosh, LLC; Gritty McDuff's; and Play It Again Sports

Shelby H. Leighton, Esq. (orally), Valerie Z. Wicks, Esq., and David G. Webbert, Esq., Johnson, Webbert & Garvan, LLP, Augusta, for cross-appellants Caleb Horton and Mario Roberge-Reyes

Dawn M. Harmon, Esq., and Jason Caron, Esq. (orally), Perkins Thompson, P.A., Portland, for appellees City of Portland and Jon Jennings

---

[5] For example, Portland's minimum wage chapter provides as one of its purposes that "phasing in the wage increase over time will allow businesses to adjust and result in reasonable annual increases in expenses."  Portland, Me., Code § 33.1 (Jan. 1, 2016).

Kasia S. Park, Esq., Jeana M. McCormick, Esq., and Sara P. Cressey, Esq., Drummond Woodsum, Portland, for amicus curiae Maine Association for Community Service Providers

Benjamin K. Grant, Esq., McTeague Higbee, Topsham, for amici curiae Maine AFL-CIO, Maine Center for Economic Policy, The Proper Cup, Maine State Building & Construction Trades Council, Southern Maine Workers' Center, People First Portland, Maine Small Business Coalition, and Portland Hunt and Alpine Club

John R. Brautigam, Esq., John R. Brautigam, Esq., LLC, Falmouth; Benjamin Gaines, Esq., Gaines Law, LLC, Portland; and Zachary L. Heiden, Esq., and Emma E. Bond, Esq., American Civil Liberties Union of Maine Foundation, Portland, for amici curiae American Civil Liberties Union of Maine Foundation and League of Women Voters of Maine

Gerald F. Petruccelli, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for amicus curie Maine State Chamber of Commerce

Cumberland County Superior Court docket number CV-2020-518
FOR CLERK REFERENCE ONLY